DELTA AND PINE LAND COMPANY *v.* JOHN P. WALLACE.

**BROKERS.** *Commissions. Sale of part of property. Proportionate recovery. Sales by principal. Reduced price.*

Where the owner of lands contracted with a broker to pay him a commission per acre for selling a specified number of acres, and subsequently, without terminating the agency, sold a portion of the lands to a purchaser procured by the broker, at a price per acre less by the amount of the commission than that at which he had authorized the broker to sell, he is liable to the broker for his commissions on the number of acres so sold.

FROM the circuit court of, first district, Hinds county.

HON. ROBERT POWELL, Judge.

Wallace, appellee, was plaintiff in the court below; the Delta and Pine Land Company, appellant, was defendant there. From a judgment in plaintiff's favor, defendant appealed to the supreme court.

Wallace, the plaintiff, claimed the right to recover commissions from the defendant, predicated of a verbal contract made with him by Watson, a superior officer of defendant, on December 3, 1898, at Beauvoir. This contract was denied by Watson, and was the principal point litigated in the case. By the terms of the contract, as testified to by Wallace, he was to receive fifty cents per acre for the sale of 16,000 acres of land, situated in Quitman county, this state; the same to be sold at $6 per acre. He further testified that he procured one Carrier as a purchaser willing and able to buy all of said lands at said price. It appeared that Watson, the representative of defendant, Wallace, and Carrier, the purchaser, all met at Memphis, Tenn. Wallace claimed that he brought about and caused the meeting—at least, that Carrier was in Memphis, by his appointment, to meet him, and that Watson unexpectedly came into the hotel where they were, and that he called Watson, and introduced the two parties, and made known to each that the other was the party interested in the land, and the proposed sale and purchase. This was denied by defendant. Watson, defendant's representative, claimed that he and Carrier were both in Memphis on other business, and that Wallace had nothing whatever to do with their being there. It was not disputed, however, that after they met in the hotel, Watson and Carrier went off together to a private room, and that Watson, for the defendant, sold Carrier something over 11,-000 acres of the land at $5.50 per acre, although the deed was not made for a week or two afterwards. About three months thereafter the defendant, through Watson, executed a deed to Carrier for all the balance of the land. Wallace claimed that the delay in executing the deed for the balance of the land was a part of a scheme to defraud him of his commissions, and that all of the land was sold at the Memphis meeting. This was de-

nied by defendant. The jury found for Wallace, awarding him the full sum demanded.

*Frank Johnston* and *Green & Green,* for appellant.

The verdict is contrary to the law and not warranted by the evidence. Appellee, in his declaration, averred that he was employed to sell 15,686.73 acres at $6.00 an acre, and that he did sell it, and he was entitled to fifty cents an acre commission by reason thereof. This contract was an entirety. Wallace, to earn his commissions, must sell the whole 15,686.73 acres; otherwise he was not entitled to any commissions.

There is no evidence, properly interpreted, tending to prove the cause of action alleged in the declaration. Those causes of action are in two counts; the first, a contract to pay commissions "an amount of money equal to fifty cents an acre for the whole numbers of acres of said lands," for a purchaser, able and willing to buy the whole number of acres, about 16,000, at a price satisfactory to Watson, and performance by Wallace; the second, a contract to pay commissions, an amount of money equal to fifty cents per acre for the whole number of acres of said land for a purchaser able and willing to purchase the whole number of acres at $6.00 per acre, and performance by Wallace.

Neither of these causes of action are proven. There is no pretense of proof of the first; a stagger at proof on the second is made. The whole transaction out of which the alleged contract arose occurred at Beauvoir, December 3, 1898, in a conversation between Watson and Wallace, and no one else was present.

The facts, apart from colorable confusion, are that in the spring and summer of 1898, Wallace had some correspondence with Watson, touching a sale of 31,000 acres of his land in a body. Finally, on August 10, 1898, Watson wrote Wallace that he would take $6.00 an acre cash or short time on deferred payments for 31,000 acres in Quitman county, and allow Wallace fifty cents an acre for selling it.

This offer was not accepted by Wallace, and this negotiation

ended. Wallace had, in the summer and fall of 1898, a deal pending with Carrier to sell him 18,000 acres of Swan and Caldwell, etc., lands in a body near Watson's land, and in the summer in going over the Swan lands Carrier saw the Watson lands, in part, and he then asked the guide whose they were, and suggested to Wallace that he did not want Watson's lands himself, but he had a friend north, Mr. Cebois, to whom he thought he could sell them, and Wallace told Carrier that the land could be had, and that Watson's price was $6.00 net; and that Carrier said if he could sell them he would do so, and he and Wallace would divide all over $6.00 to be paid Watson. As late as September 29, 1898, Carrier refers in one of his letters to Wallace to these Watson lands under this proposed arrangement.

This proposed sale was not made to Cebois. In October and November, 1898, the sale of the 18,000 acres of Swan, etc., lands was still pending, and Carrier and his attorney, Clark, came south to see about the titles. The title to the Caldwell and Swan land was defective, and on December 3, 1898, Wallace went to Beauvoir to see Watson primarily to get a quit claim deed to clear up the Caldwell title. The Swan, Caldwell, etc., land was all that Carrier then wanted or had the money to buy.

There is a variance in the testimony of Watson and Wallace as to what transpired at Beauvoir December 3, 1898, as to the sale of Watson's lands. The subject was mentioned, and Watson says he told Wallace that Swan had these lands in charge, and he would have to see him in regard thereto, and that he would not do anything. Wallace says that Watson then told him that there was a party looking over the lands, and that if he did not take them in a few days or a week or ten days, that he could sell the 16,000 acres of land upon the same terms as was named in his letter of the last summer for 31,000 acres. This letter was dated August 10, 1898, and was that he would take $6.00 cash or short time on deferred payments and allow fifty cents an acre for selling the whole 31,000 acres.

Thus, according to Wallace's own evidence, there was no un-

conditional agreement, but there was a party looking, and if he did not take it in a week or ten days, then Wallace might have the right to sell the whole 16,000 acres at $6.00 cash or on short time for deferred payments for fifty cents an acre commissions. Wallace then left Beauvoir, and never saw Watson, or had any further communication with him until they met accidently in Memphis, December 10, 1898, and he did not know until that day that the other party referred to by Watson did not take the land. That Watson was right in his recollection of that conversation at Beauvoir is demonstrated by the subsequent events.

On the morning of December 10, just one week after the Beauvoir interview, Swan and Wallace were together on the train going to Memphis to meet Carrier to try to consummate the pending deal for the sale of the Swan, Caldwell, etc., lands, and while on the train they discussed the situation. Wallace was very anxious that the deal should be made, for he had the commission on the Caldwell land, some $4,000, dependent upon Carrier's buying that land; and Swan felt confident that he could in time perfect his title, and he was anxious to have Carrier establish his saw mill near his lands as a future resource. So both Swan and Wallace were discussing how to effect that end. Swan then suggested to Wallace that there was Watson's land that might be substituted for his land, so as to make up the 18,000 acres, and he says he then, and before, told Wallace that the price of Watson's land was $6.00 net. Thus, we have the confirmation of Watson's testimony that Swan had charge of the land. No conclusion was reached by Wallace and Swan as to the Swan, Caldwell, etc., land deal until they got to Memphis, where, by appointment, they were to meet Mr. Carrier to try to consummate that Swan deal. When they got to Memphis, at the Gayosa, they found that the deal could not then be consummated as to the Swan land. Just then, by accident, without procurement by any one, Mr. Watson appeared in the lobby of the Gayosa hotel, where Carrier, Swan, Wallace, and Williams were.

There is some variance in the evidence as to who introduced

Carrier to Watson, but giving credence to all of the witnesses, except where in conflict, it appears that before Watson arrived the conclusion had been reached by Carrier that he would not then take the Swan land, and that the deal for the Swan land was off. Wallace and Swan had discussed on the train the suggestion of Swan about the Watson land and Watson's land was then mentioned to Carrier for the first time as a possible component of the 18,000 acres in lieu of the Swan land. Wallace did not then have any contract to sell the 11,000 acres, but, according to his own claim, one to sell the whole tract of 16,000 acres.

Wallace testified that just as Watson was in the act of taking the elevator, up to his room at the Gayosa, he told Watson "that this was the gentleman that we had been showing his land to. That he would like for him and Mr. Carrier to get together and agree upon the terms of payment as we had bargained the lands to Mr. Carrier for $6.00 an acre." That Watson said, "Mr. Carrier, get in and go up to my room with me, and we will talk over all these matters and I think we can make them satisfactory," and that Watson told Wallace after they came down, that he could go ahead and show them to Carrier.

It will be noted that these statements were not true; that he had been showing Watson's land to Carrier was a half truth; Carrier had seen it casually, in going over the Swan land, and when Carrier and Wallace were trying, without Watson's knowledge, to sell to Cebois, and to make all of the margin they could over $6.00 an acre, Watson's net price, nor was there any question then of Carrier's ability to buy the 18,000 acres; and it was not true that Carrier had already bought considerable land in that neighborhood. He had then bought none, and the very purpose then was to try to get him to buy land there.

Wallace's letter to Watson of December 18, 1898, written eight days after the Memphis interview, established these facts: That Swan was the person who was the procuring cause, and that Wallace had no contract for the sale of these lands, and es-

pecially not the 11,000 acres, the subject of that sale, as testified by Watson. He says in his letter, "When in Memphis I failed to ask you what commission you would allow me on the lands you offered Mr. Carrier. We told him your price was $6.00 net. Mr. Swan told me this, but I suppose you and he had an understanding, as it was to go in lieu of his, but he did not tell me what you would allow us. Mr. Williams is now making an examination, and upon his report will depend Mr. Carrier's future actions, and unless he gets something, I fear his report will be adverse, etc."

From this it is clear that Wallace knew that he had no contract with Watson. His letter never squints at a contract. His sole claim in that letter, when everything was fresh, was that Swan told him that the $6.00 was net, but because Watson's lands were substituted for Swan's in the deal he "supposed" there must be an "understanding" between Watson and Swan that commissions were to be allowed "us."

If there had been a contract for the sale of the whole 16,000 acres, and the sale was pending of 11,000 acres of it, is it not manifest that some reference would have been made to it?

Again, on April 28, 1899, Wallace wrote Watson: "In December, last, I introduced Mr. Carrier to your Mr. Watson and brought about the sale of some 11,840 acres of land in Quitman county. I claim commissions on this sale; we have written two or three letters without a reply. Now I claim about $6,000 commissions," and threatening suit.

Thus, on Wallace's own record and evidence he does not prove that there was any contract for commissions as averred, nor that he ever performed it by selling the land.

Granting for the sake of argument that the contract for commissions was made, as averred, still there was no sale made either of the 11,000 acres or the 3,500 acres by Wallace to Carrier at $6.00 an acre for part cash or on short time, the terms named in the August 10 letter.

Therefore the peremptory instruction asked for by defendant

should have been given. *Lipe* v. *Ludwick,* 14 Ill. App., 374; *Lunny* v. *Healey,* 44 L. R. A., 593; *Sibbald* v. *Iron Co.,* 83 N. Y., 383; *Mylie* v. *Marine Nat. Bank,* 61 N. Y., 416; *Moore* v. *Creasap,* 80 N. W. Rep., 400; *Hay* v. *Platt,* 66 Hun., 490; *Wilie* v. *Marine National Bank,* 61 N. Y., 415; *Sibbald* v. *Bethlehem Iron Co.,* 83 Id., 378; *White* v. *Twitchings,* 26 Hun., 503; *Putnam* v. *How,* 39 Minn., 363; *Wilie* v. *Bank,* 61 N. Y., 416; *Tombs* v. *Alexander,* 101 Mass., 255; *Barnard* v. *Mormat,* 3 Keys, 203; *McClave* v. *Paine,* 49 N. Y., 563 *Barnard* v. *Mormat,* 3 Keys, 203; *Moses* v. *Birling,* 31 N. Y., 462; *Lyon* v. *Mitchell,* 36 N. Y., 235; *Redfield* v. *Tegg,* 38 Id., 212; *Kungerford* v. *Hicks,* 39 Conn., 259; *Saterhwaith* v. *Vreeland,* 3 Hun. (N. Y.), 152; *Reese* v. *Spurane,* 45 Ill., 308; *McArthur* v. *Slanson,* 43 Wis., 41; *Chandler* v. *Sutton,* Daley (N. Y.), 117; *Bailer* v. *Smith,* 103 Ala., 643; *Watts* v. *Calkins,* 51 Ill. App., 243; *Mears* v. *Stone,* 44 Ill. App., 444; *Earp* v. *Cummings,* 54 Pa. St., 394; *Tinsley* v. *Scott,* 69 Ill. App., 352; *Freezer* v. *Lee,* 90 N. W. Rep., 914; *Huffman* v. *Ellis,* 90 N. W. Rep., 552; *Fairchilds* v. *Cunningham,* 88 N. W. Rep., 16; *Armstrong* v. *Warm,* 29 Minn., 126; *Culler* v. *Bell,* 43 Minn., 226; *Putnam* v. *Howe,* 39 Minn., 365; *Cathart* v. *Bacon,* 47 Minn., 34; *L. Halin* v. *Schuttle,* 34 Minn., 534; *Weber* v. *Clark,* 24 Minn., 354; *Illingsworth* v. *Slosol,* 19 Ill., App., 654 *Wever* v. *Clark,* 24 Minn., 354.

*McWillie & Thompson,* for the appellee.

1. The question involved herein was one of fact, and it certainly cannot be said on due consideration of the evidence that the verdict was manifestly wrong. The action was predicated of a parol contract for commissions, and the argument that none existed is entitled to no consideration here, as there is evidence to support the conclusion of the jury.

2. The circumstances strongly indicate that the successive conveyances made by the appellant to Carrier were in execution of a previous agreement or understanding that the latter would

take all of the 16,000 acres, and that the Memphis deal really included all of the 16,000 acres and not 11,000 acres only.

3. It is true that the appellee sued upon an express contract entitling him to commissions on finding a purchaser of the 16,-000 acres and not upon a *quantum meruit,* but he was entitled to recover on the contract as modified by the waiver of the appellant arising out of its sale of a less number of acres to the purchaser tendered by the appellee, without consulting the appellee.

4. When a broker procures an acceptable purchaser on the terms on which he was employed to sell, the vendor cannot defeat his claim for commissions by taking the negotiation wholly into his own hands and selling to the purchaser a part of the land on the same or different terms, without the consent of the broker.

There is nothing novel in the position that where the principal sells only part of the subject-matter of the brokerage, the broker is entitled to commissions on the part so sold. *Wood v. Stephens,* 46 Mo., 555; *Bailey* v. *Chapman,* 41 Mo., 536; *Kimberly* v. *Henderson,* 29 Md., 512.

The jury being justified in treating Wallace as the procuring cause we ask the court's consideration of the following cases and the elaborate notes appended to the reports of the same in which the subject here involved is very fully discussed. *Hoadley* v. *Savings Bank,* 44 L. R. A., 321; *Lunney* v. *Healey,* Ib., 593; *Blake* v. *Stump,* 10 Ib., 103; *Potvin* v. *Curran,* 13 Neb., 302.

Somewhat similar cases are cited to show how reluctant appellate courts are to disturb a verdict for the broker where there is any evidence to sustain it. *Loyd* v. *Malhews,* 51 N. Y., 124; *Chase* v. *Veal,* 83 Tex., 333, 18 S. W., 597; *St. Felix* v. *Green,* 34 Neb., 800 (52 N. W., 821); *Gillen* v. *Wise,* 14 Daly, 480; *Esmond* v. *Kelly,* 49 Hun. (N. Y.), 610; *Anderson* v. *Cox,* 16 Neb., 10, 20 N. W., 10; *Hoefling* v. *Hambleton,* 84 Tex., 517, 38 Am. St., 451; *Dubois* v. *Dubois,* 59 Iowa, 216, 6 N. W., 261.

We insist that the judgment should be affirmed as it stands,

but in no event should there be a reversal, for should the court conclude that Wallace was not entitled to recover commissions on the 3,578.34 acres conveyed in November, he clearly was on the 11,646.91 acres conveyed in March, and the 160.94 acres conveyed in April, and should be allowed to remit the excess, the commissions recovered being fifty cents per acre on all the lands mentioned in the declaration and set out in the three deeds before referred to, and the excess is susceptible of perfectly definite and accurate ascertainment.

Wallace proved his contract for commissions on all the lands and tendered Carrier as a purchaser. Watson, according to his version of the matter, only sold Carrier 11,000 acres on that day, but when he came down stairs after his private negotiation with Carrier, he told Wallace to go on and show and sell Carrier the land without further agreement or understanding. If this was not a waiver by Watson of the requirement to sell 15,000 or 16,-000 acres there is no such thing as a waiver; and Wallace is entitled to recover compensation proportionately on the acreage sold, not on a *quantum meruit,* but on the contract as modified by the waiver in respect to acreage.

The following authorities are pertinent and maintain our contentions:

A real estate agent who succeeds in bringing his principal and the buyer together, whereby a sale is perfected, is entitled to his commission. *Hafner* v. *Herron,* 60 Ill. App., 592; affirmed in (1896) 165 Ill., 242; 26 N. E., 211.

A broker employed to sell lands, or to find a purchaser for them, who brings and introduces a buyer to the owner, and starts negotiations between them, which result in a sale, is entitled to his commission, though he is not present during the negotiations and until the completion of the sale. *Dreisback* v. *Rollins,* 39 Kan., 268, 18 Pac., 187.

In general, if a broker introduces a purchaser, and such introduction is the foundation upon which the negotiations are conducted, and the sale made, the broker will be entitled to his com-

missions. If, however, by special contract the broker is not to receive any compensation unless the property is sold at a stated price, he is not entitled to commissions unless the property be sold at that price, or unless he introduces a purchaser who is willing to buy, and was prevented from making the sale by the fault of the purchaser. *Schwartze* v. *Yearly,* 31 Md., 270.

Upon an oral agreement between the owner of real estate and a broker for the sale by the latter of certain real estate, the broker is entitled to compensation if he substantially effects a sale by procuring and introducing a purchaser to whom the owner sells the land. *Desmond* v. *Stebbins,* 140 Mass., 339, 5 N. E., 150.

When a single broker is employed to sell land, and he introduces a buyer, and a negotiation and sale result, the owner and buyer cannot, by any arrangement between them, defeat the claim of the broker for remuneration. *Vreeland* v. *Vetterlein,* 33 N. J. Law (4 Vroom), 247.

The duty of a broker of real estate is discharged when he has found a party who will be acceptable to the owner, and enter into a contract of purchase with him; and when he produces such party to his principal, the broker is entitled to his commissions; nor will the fact that, after the contract was signed, the purchaser refused to perform the same on account of misrepresentations on the part of the owner, effect the claim of the broker for such commissions. *Glentworth* v. *Luther,* 21 Barb., 145.

A broker is entitled to compensation if the sale is effected through his agency as its procuring cause; and if his communications with the purchaser were the cause or means of bringing him and the owner together, and the sale resulted in consequence thereof, the broker may recover. *Lloyd* v. *Matthews,* 51 N. Y., 124.

A broker employed to sell real estate earns his commissions if, through his instrumentality, the buyer and seller meet, and negotiations are thus opened between them which culminate in a

sale, though for a sum less than first fixed by the principal. *Levy* v. *Coogan*, 9 N. Y. Sup., 134, 16 Daly, 137.

If a broker accepts an employment that makes his rights to commission depend on procuring a purchaser on specified terms, he cannot recover if he does not perform that service, where the employer does not interfere and prevent performance. *Briggs* v. *Rowe*, 1 Abb. Dec., 189, *43 N. U. (4 Keyes), 424.

When a broker produces an acceptable purchaser, in the manner and under the agreement stated, he will not be deprived of his commission because the principal part of the consideration paid for the land by the buyer is other real estate which has been owned by him. When the sale is consummated with such purchaser, at the price asked, and on terms satisfactory to the owner, the broker has discharged the obligation of his contract. *Dreisback* v. *Rollins*, 39 Kan., 268, 18 Pac., 187.

A real estate broker is entitled to the commission agreed on for the successful negotiation of an exchange of property placed in his hands, if the terms of exchange are accepted by the owner as the obligation to pay the commission then becomes fixed. *Lockwood* v. *Halsey*, 41 Kan., 166, 21 Pac., 98.

Where one employs a broker to effect a sale, and the broker finds a purchaser, who enters into a written promise to take the property on the required terms, the broker is entitled to his commissions, though his employer afterwards releases the buyer from the contract, and resells on different terms to another. *Levistones* v. *Landreaux*, 6 La. Ann., 26.

In an action to recover commissions as a real estate broker, it appeared that the broker's agent called the purchasers' attention to the land, carried on active negotiations with them, took them to see the property, gave them the owner's name, and used every means to make a sale. The purchasers finally made an offer for the lands, which was refused by the owner. Subsequently, the owner sold to the purchasers, but refused to pay the commissions, saying the deal was a poor one. Held that, as the broker was the active procuring cause of the sale, he was entitled to his

commissions, though he did not bring the owner and purchasers in actual contact, and though the sale included other land, for which negotiations had been pending for sometime before the broker's employment. *King* v. *Bauer* (Com. Pl.), 8 N. Y. Sup., 466.

Where a real estate agent under contract to pay commissions upon finding a purchaser, produces a person who is able and offers to purchase upon the required terms, he is entitled to his commissions. If in such case the terms include credit to the purchaser, it is to be given at the vendor's risk, and failure to perform accordingly will not affect the agent's right to commissions. *Greene* v. *Hollingshead,* 40 Ill. App., 195.

A real estate agent employed to procure a purchaser for land is entitled to his commissions when he has procured a customer who is willing and able to buy the property, and with whom the principal enters into negotiations which result in its purchase by him. *Hanna* v. *Collins,* 69 Iowa, 51, 28 N. W., 431.

Where a broker is employed to sell property at a stated price, and he finds a customer who is able and willing to take the property at that price, and upon the stated terms, he is entitled to compensation whether a sale is effected or not. *Cassady* v. *Seeley,* 69 Iowa, 509, 29 N. W., 432.

A real estate agent who procures a purchaser ready and willing to purchase land on the terms on which he was employed to sell is entitled to his commissions, though the vendor, with knowledge thereof, voluntarily completes the sale on different terms. *Corbel* v. *Beard,* 92 Iowa, 360, 60 N. W., 636.

A real estate broker, who has succeeded in getting a purchaser to consider favorable the terms of sale, and who has brought the negotiations to a point where they undoubtedly would have resulted in a contract, is entitled to his commissions if the principal then interferes, personally takes up the negotiations, and, with the advantage he has obtained from the broker's work, succeeds in selling the property to the purchaser procured

by the broker. *Carroll* v. *Pettit,* 67 Hun., 418, 22 N. Y. Sup., 250.

A principal who obtains knowledge from his broker that an intending purchaser procured by the broker is a person of whom he had learned from another source as being a possible purchaser, owes the broker the duty of either terminating the agency or notifying him that he intends personally to conduct further negotiations; and, on his failure so to do, the broker is entitled to commissions, though the sale was completed by the principal himself. *Carroll* v. *Pettit,* 67 Hun., 418, 22 N. Y. Sup., 250.

Where real estate agents employed to sell land within a certain time, after the expiration of the time, at the request of the owner, and on a promise by him that he will pay them a commisson if sale is effected, irrespective of the purchase price, and though the sale be made directly by him, write to a prospective purchaser, with whom they have been in correspondence, offering the land for a certain price, and the purchaser, as a result of the letter, purchases the land directly from the owner, the agents are entitled to their commissions. *Holland* v. *Howard,* 105 Ala., 538, 17 So. Rep., 35.

A vendor cannot escape liability for commissions to a real estate agent employed to negotiate a sale of the land, on completing himself a sale to a purchaser with whom the agent had been negotiating by including in the sale other lands in addition to those the agent was employed to sell. *Ranson* v. *Weston,* 110 Mich., 240, 68 N. W., 152.

Where land is put in the hands of a real estate agent for sale, and a sale is effected through his exertions, he is entitled to his commissions, even though the negotiations are conducted and the sale concluded by the owner and the purchaser. *Jones* v. *Berry,* 37 Mo. App., 125.

Where a broker, who is employed to sell property at a given price and for an agreed commission, has opened a negotiation with a purchaser, and the principal, without terminating the

agency or the negotiation so commenced, takes it into his own hands and concludes a sale for a less sum than the price fixed, the broker is entitled at least to a ratable portion of the agreed commission. *Martin* v. *Silliman,* 53 N. Y., 615.

When a broker, authorized to sell at private sale, has commenced negotiations the owner cannot, pending the negotiations, take it into his own hands and complete it either at or below the price limited, and then refuse to pay the commissions. *Keyes* v. *Johnson,* 68 Pa. St. (18 P. F. Smith), 42.

A real estate agent was applied to by B, an owner of land, to sell it for him. B gave to A a written description of the land, and stated the price at $2,050, $50 of which sum was to be the perquisite of A for effecting a sale. C obtained from the agent a copy of the description, called on B, and asked him what he would take for the land. B replid, $2,000, which C gave, and received a conveyance. Held, that the seller was responsible to the agent for the perquisite of $50. *Alexander* v. *Breeden,* 53 Ky. (14 B. Mon.), 154.

Where property is put into the hands of a real estate agent for sale, and a sale is brought about through his exertions or agency, he is entitled to his commissions, even though the final negotiations were conducted without his knowledge, and the owner, in order to make the sale, was compelled to vary the original price and terms. *Stinde* v. *Blesch,* 42 Mo. App., 578.

Where an owner of land places it in the hands of a broker to be sold for $4,000, and, at the instance of the broker, a proposed purchaser looks at land, and afterwards buys it from owner for $3,750, the latter is liable for the broker's commissions. *Byrd* v. *Frost* (Civ. App.), 20 S. W., 46.

In an action for broker's commissions it appeared that plaintiff was employed by defendants to effect an exchange of property; that he referred them to certain property and they promised him that, if they exchanged for it they would pay him $500; that he told them the names of the owner and of the agent for the property; and that they accomplished the ex-

change through the latter, ignoring the plaintiff. Held, that a verdict for plaintiff would not be disturbed. *Gillen* v. *Wise,* 14 Daly, 480.

In an action by a real estate broker against a married woman for commissions there was evidence that defendant's husband, as her agent and in her presence, employed plaintiff to sell certain property on an agreed commission; that plaintiff negotiated with one D, but that, pending such negotiations defendant, who had learned of the desire of D to purchase the property through plaintiff, sold to him in person, without signifying in any way that the agreement between her and plaintiff was at an end. Defendant introduced evidence tending to contradict plaintiff's evidence. Held, that a verdict for plaintiff would not be disturbed. *Esmond* v. *Kingsley,* 49 Hun., 610, 3 N. Y. Sup., 696.

Where, in an action by brokers to recover commissions for selling land, the testimony of both plaintiffs that they were hired by defendant, and procured three purchasers, is slightly corroborated by some of the witnesses but is flatly denied by defendant and the purchasers, a finding for plaintiffs will not be reversed because contrary to the weight of evidence. *Chase* v. *Veal,* 83 Tex., 333; s. c., 18 S. W., 597.

In an action by brokers for commissions for selling land, where the petition alleges that the tract contained 35 acres, and that the purchaser agreed to purchase it "for the sum of $200 per acre, and in the aggregate for the sum of $7,000," and that defendant agreed to allow plaintiff 5 per cent for procuring a purchaser, and the evidence shows that the land was supposed to contain 42 acres, and was sold for $7,000, but that after the sale it was found to contain only 35 acres, whereupon defendant made the sale for $6,500, a judgment for 5 per cent on the $6,500 is warranted, and defendant cannot object that the pleadings alleged a sale for $200 an acre, while the evidence showed a sale for less than that amount. *Hoefling* v. *Hambleton,* 84 Tex., 517; s. c., 19 S. W., 689.

A Frenchman, residing in Iowa, wrote to his neighbor, also a Frenchman and land broker, who had gone on a visit to France, to procure him a purchaser for his farm at $4,000, for which he would allow $200 brokerage. The broker was approached a year afterwards by a Frenchman in New York who desired to purchase a farm. The broker took him to Iowa, showed him the farm in question, told the seller to be reasonable in his terms, and afterwards remarked to a witness that he had fetched the seller to terms. The purchaser took the land at $4,000. Held, that the evidence was insufficient to show that the broker was the agent of the buyer and not of the seller, and that he was entitled to the agreed compensation of $200. *Dubois* v. *Dubois,* 54 Iowa, 216; s. c., 6 N. W., 261.

In an action by a real estate agent for commissions plaintiff's evidence showed that, two or three years before the sale, defendant had verbally authorized him to sell the land for a named price; that a year later defendant had written plaintiff a letter authorizing him to make a sale for $1,800; that just before the sale plaintiff telegraphed defendant asking if he would sell for $1,700, to which defendant replied that $1,800 was the lowest price; and that plaintiff immediately made a contract of sale for $1,800 which defendant refused to carry out. Held, that the proof was sufficient to show that plaintiff had beeen employed to make the sale. *Holden* v. *Starks,* 159 Mass., 503, 34 N. E., 1069; s. c., 38 Am. St. Rep., 451.

Argued orally by *Marcellus Green* and *Frank Johnston,* for appellant, and by *T. A. McWillie* and *R. H. Thompson,* for appellee.

WHITFIELD, C. J., delivered the opinion of the court.

The jury must have believed the following to be the facts: That Wallace had a contract, made on December 3, 1898, at Beauvoir, with Mr. Watson, acting for the Delta & Pine Lumber Company, by which he was to be paid 50 cents an acre for

selling the lands embraced in the declaration (some 16,000 acres); that Mr. Watson had agreed in August, 1898, to give him said commission for selling some 31,000 acres; that at the interview at Beauvoir he had agreed to give him this commission of 50 cents an acre for selling a quantity of land equal to the 31,000 acres, less the land West of Cold Water river, which would be a body of 16,000 acres, the quantity named in the declaration; that at the conference in Memphis, in December, 1898, Watson agreed with Wallace that he should show Carrier this 16,000-acre tract; that Watson had failed to make this sale to parties with whom he had been negotiating at the time of the interview December 3, 1898; that he had so told Wallace at the interview in Memphis, about the middle of December, 1898, and had then told Wallace to go ahead and sell it to his man Carrier (meaning by "it" the 16,000-acre tract), and upon the previous understanding, of course, that he would pay him 50 cents an acre for so doing, but that, after this interview at Memphis, Wallace showed the Watson land, in January, 1899, to Carrier, putting himself to great pains and expense in doing so, and that as the result of Wallace's efforts, Carrier finally bought the 11,000-acre tract, as it is called (to be exact, the tract contained 11,646.91 acres, conveyed March 15, 1899); that Wallace was the procuring cause of the sale of this tract by Watson to Carrier. And they must have rejected Mr. Watson's account of the alleged verbal contract made on December 3, 1898, at Beauvoir. The jury manifestly did not attach to the letter of December 18, 1898, written by Wallace to Watson, the damning effect which counsel for appellant ascribed to it. Wallace's explanation of this letter is that, knowing that he only had a contract to sell 16,000 acres, on a commission of 50 cents per acre, he supposed the law to be that, unless he sold the whole 16,000 acres, he could not recover any commissions, and hence that it was necessary to have an agreement for *pro rata* commissions on any less quantity he might sell, and that he so wrote this lettter for the purpose of se-

curing an engagement from Watson to pay him the same commissions at the same rate (50 cents per acre) for the sale of the 11,000-acre tract referred to. The jury accepted this statement as true. Undoubtedly Wallace did put himself to great pains about the sale of this land. It is incredible that he would have undertaken to show to Mr. Carrier, in the dead of winter, these lands under the very trying hardships disclosed in the testimony, himself providing teams, wagons, etc., without expecting some sort of remuneration. It is clear that Carrier and Watson were entire strangers, and that Carrier came to Memphis to look at these lands, together with the Panola lands, through Wallace's efforts, largely; and Carrier practically admits that on his subsequent visit, when he came and brought his attorney and his own inspector, he went to the coast to see Watson, while they went to New Orleans, and that, in effect, he left Pennsylvania to see Watson about these very lands, which Wallace, acting for Watson, had twice shown him in January, 1899. We have given the whole of this testimony the most careful consideration, reading and rereading it again and again, and cannot say that the verdict of the jury is plainly and manifestly wrong. So far, therefore, as Wallace's commissions on the sale of the 11,646.91 acres of land conveyed by the deed of March 15, 1899, are concerned, we decline to disturb the verdict. But in view of the testimony of Carrier with respect to the purchase of the 3,578 acres conveyed by the deed dated November 14, 1899, we do not think the verdict was warranted as to that tract of land. Carrier says he made the deal for this tract in August or September, 1899. The date of the deed shows that it was not consummated until November, 1899. Carrier further says that he had no idea of purchasing this tract at the time he bought the 11,000-acre tract; that it was a wholly separate transaction. While Mr. Currier's testimony about certain commissions (that he was, in certain contingencies, to share with Wallace and Williams, as a result of buying lands of Watson at one price, and then selling them to his rich friend in Pennsylvania, Mr. Cebois, at a

higher price) is not altogether reassuring, yet we are inclined to think that the lapse of time between the execution of these deeds (from March 15, 1899, to November 14, 1899) is so great, and further, that the amount of land which Wallace, by his letter of December 18, 1898, was seeking to have Watson pay him commission on, was so exactly the qauntity of this 11,000-acre tract, the jury should have limited the commissions Wallace was entitled to to the amount due on the sale of the quantity of land embraced in the said deed of March 15, 1899. As quite decisive of the incorrectness of the jury's view on this point, we refer to Wallace's letter of April 28, 1899, in which he only claimed about $6,000 commissions—the amount, at 50 cents per acre, due on the 11,646.91-acre tract. This letter was written April 28, 1899, and the sale of the 3,500 acres was only consummated in November, 1899. These considerations are decisive that the jury's conclusion is manifestly wrong as to the commissions on the 3,500-acre tract.

We do not think the contention of learned counsel for appellant is sound—that Wallace was not entitled to a *pro rata* commission on the *quantum meruit* basis—under the peculiar facts of this case. We think Wallace was entitled, on a *quantum meruit* basis, on the facts of this case, to the commissions on whatever land, as shown, he procured to be sold for Watson to Carrier. The case is covered perfectly by that of *Woods* v. *Stephens,* 46 Mo., 556, and the case of *Martin* v. *Silliman,* 53 N. Y., 615. The principle as laid down in the former is that Wallace fulfilled his contract, so far as permitted by Watson. The court say on the very contention made here: "The defense assumes one of two things: Either that, by his contract with his agents, the owner was bound to sell according to the terms furnished them, and had no power to vary them, or that, by a slight variance, after they had furnished the purchaser, he could defraud them of their compensation. Neither position has a show of reason." In the New York case the court held: "Where a broker who is employed to sell property at a given price, and for an agreed com-

mission, has opened a negotiation with a purchaser, and the principal, without terminating the agency or the negotiation so commenced, takes it into his own hands and concludes a sale for a less sum than the price fixed, the broker is entitled at least to a ratable proportion of the agreed commission." It is not for Watson to stand part of the time for a sale in block—first 31,000 acres, then 16,000 acres—and then, at last, without discharging Wallace, and without giving him any notice, to take the matter into his own hands and do precisely what Wallace was trying to do for him, to wit, to sell this 11,000 acres at $5.50 per acre. The price Wallace shows he put on the 16,000 acres was $6, out of which his commission of 50 cents per acre was to come, which would be $5.50 net to Watson; and that is the precise price at which Watson did sell, and that is the precise quantity of land which Wallace, according to the finding of the jury, procured Carrier to buy. It is not for Mr. Watson to say, under these circumstances, that Wallace did not sell the whole 16,000 acres, since he himself prevented him from doing so, and so prevented him by selling himself a less quantity; and that quantity, the very quantity Wallace procured, according to the jury, the sale of for Watson. This very principle is recognized in *Illingsworth* v. *Slosson,* 19 Ill. App., 614 (one of the authorities relied on by appellant), where the court say: "It does not appear that the broker . . . was prevented from accomplishing what he expected by any act of defendant." This view of the law is supported by many authorities cited by learned counsel for appellee.

*If the appellee will remit so as to claim commissions only on the 11,646.91 acres conveyed by the deed of March 15, 1899, the judgment will be affirmed; otherwise the judgment will be reversed and the cause remanded.*