## Estes *v.* Jones.

[80 South. 526, Division B.]

1. **Principal and Agent.** *Undisclosed agency. Liability of agent.*
   Where an agent makes a contract without disclosing the fact that he is acting as agent, he is personally bound.

2. **Master and Servant.** *Wrongful discharge. Change of contract.*
   While it is ordinarily true that a manager would have to follow the directions of his employer in managing the place, where such directions and instructions are reasonable, yet the parties may, by the express terms of the contract, so agree as to divest the owner or employer of the right to direct and control the manager.

3. **Same.**
   It is competent for the parties to contract so as to give the manager the exclusive right to determine what shall be done and who shall be employed and who discharged, and if the parties do so contract, the employer cannot without the consent of the manager, change or alter the contract so made.

4. **Appeal and Error.** *Finding of jury on conflicting evidence. Review.*
   The supreme court, on appeal, will not disturb the finding of the jury on conflicting evidence.

Appeal from the circuit court of Washington county. Hon. S. J. Osborn, Special Judge.

Suit by S. R. Jones against A. J. Estes. From a judgment for plaintiff, defendant appeals.

The facts are fully stated in the opinion of the court.

*Percy Bell,* for appellant.

*Percy & Percy,* for appellee.

Etheridge, J., delivered the opinion of the court.

S. R. Jones filed suit against A. J. Estes for wrongfully discharging said Jones as manager of a planta-

tion in the year 1916. Mrs. Jones, wife of appellee, testified as to the contract employing Jones that Estes said:

"Mr. Jones, I want a man to manage the plantation, and I will give you the work. I will expect you to supervise the farming operation and have entire charge of the plantation. Your duties will be to ride over the tenants and have the supervision of everything; I will furnish you with an assistant; . . . he is a good hand with gear and mules; he will look after the gear and mules, and stay with the day hands, . . . and if at any time his services are not satisfactory you may discharge him, because I am looking to you to deliver the goods."

S. R. Jones, appellee, testifies as to the contract as follows:

"We discussed my taking the place; . . . I hired to him, and he was to give me one hundred dollars per month and furnish me a house to live in, wood and such stuff on the plantation. . . . I assured him if I took the place I wanted free range; I wanted to go the limit. . . . I then took up with him the question of my duties. . . . I said if you are going to look to me to deliver the goods I would like to furnish my own man. He said: "I have a young man at home who is a good hand with mules, teams, and things like that; I think you will find him all right, and if you don't find him all right you can send him back. I look to you to deliver the goods, and it will suit him to go back to Missouri; you can then select your own hand.' I went to work. He was to give me one hundred dollars per month, and I was to actually have charge of the plantation. This man (meaning the assistant) was to go to the lot in the morning and get the mules out and look after the day hands."

This contract continued from year to year without any specific new agreement. Jones had employed an assistant by the name of Shock. In 1916 Shock got

into some difficulty with one of the laborers on the place and Jones discharged him. When Shock was discharged Mr. Estes came down and finally ratified the discharge of Mr. Shock and agreed to furnish another assistant; he stated to Mr. Jones that he would send his (Estes') son to assist him, and Jones asked Estes:

"I want to know how your son is coming; if he is coming I want to know if I am going to boss your son or he boss me."

And Estes said: "My son will come as your assistant altogether."

And Jones said: "If he comes as my assistant and under my authority, I will be glad to have him."

Estes returned to Missouri, where he lived, and wrote a letter to Jones in which he sated that he was sending his son; from which we quote as follows:

"I have arranged with my son Ambrose to come down and assist you; he will leave in a day or two for the plantation. . . . Now I do not want him to take Mr. Shock's place, but I want him to assist you and be under your supervision. In other words, I do not want him to succeed you, but owing to recent difficulties there on the plantation I want him to do the riding principally among the tenants over the plantation; I will expect you as you have the day labor, and are thoroughly acquainted with the condition of the mules, harness, machinery implements and other work that goes in your way."

Mr. Jones thereupon wrote Mr. Estes, from which we quote:

"I am perfectly willing, in fact anxious, to complete my contract. I am on the ground discharging my duties to the best of my ability under the contract. I will not, however, be willing for your son to manage the tenants and me assume Mr. Shock's duties, and so advised him this morning. If he or you are not willing for him to assume Mr. Shock's place will respectfully ask that you send me a man who will. If you insist on him

riding the tenants, and my assuming the duties of the assistant you will have to discharge me and place him in charge, for I am not willing at this late day for my duties to be changed. I feel, however, that I must advise that if I am discharged that I will expect my salary to be paid until January 1, 1917.''

Young Estes came, and Mr. Jones told him that he had better have his father come down and they would have an understanding. Mr. Estes came and insisted that Mr. Jones permit young Estes to take charge of the tenants, and that Mr. Jones superintend the day wage laborers. Mr. Jones refused to agree to do this and insisted that under his contract he had the right to manage the plantation and to employ and control the assistant manager and the tenants as well as superintend the day laborers, and that it was the duty of the assistant to superintend the day laborers. Jones testified that when he refused to agree to Estes' wishes that Mr. Estes told him that if he did not do as he desired him to do he had no further use for him. Thereupon he asked Mr. Estes if he was to consider himself discharged, and that Mr. Estes told him ''Yes;'' and that he notified Mr. Estes that he would hold him for his salary. Jones' testimony is supported by the testimony of Mrs. Jones on this point, while it is denied by Mr. Estes. Mr. Estes testified that he did not discharge Jones, but told him he could stay on the place, and that his son would remain as assistant under him, but that he insisted on the arrangement above set out. Jones moved away from the plantation, but did not secure other employment until September, when he secured other employment at one hundred and fifty dollars per month for the balance of the year. The question of whether Estes discharged Jones or whether he did not was submitted to a jury under proper instruction.

It appeared in the testimony that the plantation, which Jones was employed to manage, in fact belonged

119 Miss.—10

to a corporation of which Mr. Estes was the general manager, but the parties, Jones and Estes, in their negotiations dealt with it as though it was the property of Estes. There was no plea setting out that the contract was made between Jones and the corporation.

The appellant urges three propositions for a reversal of the case: First, that the action should have been brought against the Alp & Woodside Planting Company, a corporation, the owner of the plantation, instead of against Estes individually; second, that Estes' directions were reasonable and justified the discharge of Jones for failure to obey them if he was discharged; third, that Jones was not discharged, but abandoned his employment.

As to the first proposition, the testimony of all the parties giving the substance of the verbal contract shows that Estes and Jones dealt with the plantation as though it belonged to Estes, Estes making no disclosure to Jones that he was acting on behalf of the corporation in making such contract. In such cases the contract will be dealt with in an action of this kind as though Estes was the real owner. In 2 C. J. 816, the rule is stated:

"It is the duty of an agent, if he would avoid personal liability on a contract entered into by him on behalf of his principal, to disclose not only the fact that he is acting in a representative capacity, but also the identity of his principal, as the person dealt with is not bound to inquire whether or not the agent is acting as such for another."

At page 818 of the same authority the following is stated:

"With stronger reason an agent who, without disclosing his agency, enters into contractual relations in his own name with one who is unaware of the agency binds himself and becomes subject to all liabilities, express and implied, created by the contract and transaction, in like manner as if he were the real principal,

although in contracting he may have intended to act solely for his principal, and although the other party afterwards discovers the undisclosed principal, unless he waives his right to hold the agent and elects to hold the principal.''

As to the second proposition, it is ordinarily true that a manager would have to follow the directions of his employer in managing the place, where such directions and instructions are reasonable. *Jerome* v. *Queen City Cycle Co.*, 163 N. Y. 351, 57 N. E. 485; *Von Heyne* v. *Tompkins,* 89 Minn. 77, 93 N. W. 901, 5 L. R. A. (N. S.) 524. But the parties may by the express terms of their contract contract so as to divest the owner or employer of the right to direct and control the manager. It is competent for the parties to contract so as to give the manager the exclusive right to determine what shall be done and who shall be employed and who discharged, and if the parties do so contract the employer cannot without the consent of the manager change or alter the contract so made. If the evidence of Jones and his wife is true (and the jury passed upon it and adjudged it to be true), then Jones had the contract right to control the plantation, and to employ, direct, and discharge his assistant. A finding of the jury also adjudged necessarily that Jones was wrongfully discharged, and, as the evidence was conflicting we cannot disturb this holding.

We think there are no reversible errors in the case, and the judgment is affirmed.

*Affirmed.*