HILL, et al. *v.* CAPPS, et al.

No. 42805 January 27, 1964 160 So. 2d 186

602

*Satterfield, Shell, Williams & Buford,* Jackson, for appellants.

604

*Jacobs, Griffith & Hatcher,* Cleveland, for appellees.

LEE, P. J.

The declaration by Charles W. Capps, Sr. and Charles W. Capps, Jr., a partnership, d.b.a. Capps Insurance and Real Estate, sued Edward B. Hill and others to recover a broker's commission in the sum of $11,450, being 5% of the sale price, under an alleged contract to that effect.

The pleadings raised, and the evidence was directed to, a determination of whether or not an alleged oral contract was entered into by and between the plaintiffs and the defendants, by and through Edward B. Hill, for and on behalf of himself and the other defendants, for the sale of approximately 916 acres of land in Bolivar County, Mississippi, as described therein, and whether or not the plaintiffs performed their requisite duties and earned the commission, in accordance with the contract. At the close of the evidence, the court sustained a requested peremptory instruction for the jury to find for the defendant William Kenan Hill, and he was discharged. The case was submitted to the jury as to the other defendants and it found a verdict for the plaintiffs against all of them for the full amount demanded. The losing defendants appealed to this Court; but no appeal was taken by the plaintiffs from the discharge of the other defendant.

C. W. Capps, Sr. and Edward B. Hill were friends of long standing. They often played gin rummy together at the Country Club in Cleveland. Capps, Sr. testified that Edward B. Hill, in a conversation at the Club on August 1, 1962, said that a brokerage agent wished to sell some land for him, and he was advised that the "Symond Place" would be sold for $235 per

acre. Capps offered the opinion that the property was worth more but Hill insisted that he would take that amount. Capps asked permission to try to sell it. Hill replied that "the real estate commission has got to be negotiated." Capps said he told Hill then and there that "if we sell it, the commission will be five per cent." The conversation then drifted off to the details, $54,000 being the amount of money necessary for the down payment, together with the other matters incidental thereto. Finally, just before the conversation ended, Capps asked Hill, "Is it all right for us to go ahead and offer the place for sale?" Hill's reply was, "Hell, yes."

Edward B. Hill denied that he had made a contract or agreed to a fee for the sale. However, when he was asked on cross-examination, "But you don't know whether you mentioned that it would have to be negotiated, or he mentioned that it would have to be 5% — you don't know which came first in your conversation?", his reply was, "Well, I can't recall exactly, no, sir. But I know that I said it would have to be negotiated because I was trying to avoid getting into an argument."

Capps testified that he was in almost daily contact with Hill with reference to this sale, and that the question of commission was not raised again until the escrow money to bind the sale and purchase had been deposited in the bank. There was considerable evidence by both of the Cappses and their employees to show the constant work and attention which was entailed by them in an effort to sell this property. It developed that Mrs. Mary Catherine Gerard, an employee of plaintiffs, contacted Milton Smith, informed him that this property was for sale, and advised that the demanded purchase price was $250 per acre. Following this approach by Mrs. Gerard, Milton Smith and his brother, Clarence, contacted Capps, Sr., with the final result that the sale was consummated for $229,000. Milton and Clarence, prior to consumma-

tion, let their cousin, W. L. Smith, come into the sale for a one-half interest, as he desired it for two of his sons.

The contract of purchase and sale, dated September 19, 1962, providing for a consideration of $229,000, was executed by Dr. William Kenan Hill, Warwick V. Smith, LePoint Cassibry Smith, Jeanette P. Hill and Edward B. Hill, as grantors, and C. Milton Smith, Clarence R. Smith and W. L. Smith, as grantees.

The record contains the following facts and circumstances relative to Hill's authority and agency concerning this land:

Hill admitted that (1) He acquired the land in question in 1948, becoming the sole owner at the time; that

(2) he conveyed a one-half interest in this property to his son, William Kenan Hill, and one-fourth each to his niece, LePoint Cassibry Smith and to her husband, Warwick V. Smith. The conveyance was a gift except that the grantees were required to pay $45,000 to Sarah Ann Hill, the daughter of the grantor, but nothing had ever been paid to the daughter on this account; that

(3) from 1949 through 1958, the land was farmed by Triumph Farms, the tradename of Mrs. Jeanette Hill, wife of the grantor; and for the entire period, as above-stated, Hill alone managed and operated the property, receiving the income of all kinds and distributing it in his discretion, as he deemed fit, after payment of taxes and incidental expenses; that

(4) in 1959, Hill, by written instrument, leased the property to Vernon Springer, signed and executed the lease as agent for William Kenan Hill, a grantee in the deed from him; that

(5) for the years 1960, 1961, and 1962, the lease agreement for all of those years was signed and executed by Hill as agent for all of the named record owners. In addition to his complete managerial control, he continued to collect the income from rice and other

products and distributed the same as he saw fit, the lessees at all times dealing solely with him; that

(6) this property has been generally known as the "Edward B. Hill Place." When some 200-odd acres of the original tract was previously sold, Hill conducted all of the negotiations in connection therewith; that

(7) he did not, at the time of making the alleged contract with Capps, disclose any lack of authority on his part, but assured Capps that he could deliver the title; and that

(8) in connection with the details of the sale, namely the conferences between the sellers and the purchasers, and the attorney who was preparing the papers, Hill alone acted for all of the record owners.

Besides, it appeared that notwithstanding LePoint Cassibry Smith and her husband were actually the record owners of a one-half interest in the property, nevertheless they endeavored to raise money to buy one-half of the interest which Milton and Clarence Smith proposed to purchase, apparently doubtful of their real right to claim at that time a one-half interest in the property as a result of the gift from their uncle.

In addition, LePoint Cassibry Smith and husband had knowledge that the services of the plaintiffs were being utilized in an effort to sell this property. And, in spite of the claim of Mrs. LePoint Cassibry Smith that she protested to her uncle against participation by the plaintiffs in the sale, they did not at any rate communicate to the Cappses any opposition thereto or denial of Hill's authority in the matter. This was in spite of the fact that Hill repeatedly assured the plaintiffs that he could deliver the title.

The appellants have assigned as errors and maintain on this appeal that they were entitled to have their several requested peremptory instructions given because (1) no contract was entered into between the parties; (2) Mrs. Jeanette Rankin had no title or interest in the

property; and (3) the defendants, other than Edward B. Hill, had not given him any authority to act for them. Besides, they say that the court erred in permitting a recovery for the one-half interest purchased by W. L. Smith; that the instructions were in hopeless conflict; and that it was error to overrule their motion for a new trial.

## DID CAPPS AND HILL, UNDER THE EVIDENCE, ENTER INTO A CONTRACT?

The assent of the parties in the formation of a contract must necessarily be gathered from their words, acts and outward expressions. 17 C. J. S., Contracts, § 32, pp. 640-643. See also 12 Am. Jur., Contracts, § 19, pp. 515-517. Besides, in Kimbrough v. Smith, 201 Miss. 202, 28 So. 2d 850, the opinion went into great detail in the statement of the facts and concluded that, under those circumstances, Kimbrough and Smith had entered into a contract wherein the latter had impliedly agreed to pay the former a broker's fee for the sale of land. After citing authorities, it was observed that Kimbrough expected pay; that he told Smith he was supposed to pay; that the services continued thereafter; and that the services were valuable to Smith. In syllabi 2 and 3, the rule was correctly stated as follows:

"To show an implied contract to pay for broker's services, it must appear that they were performed under such circumstances as to give the recipient thereof some reason to think that they were not gratuitous and not performed for some other person but with expectation of compensation from recipient, and services must have been beneficial to person sought to be made liable.

"A contract to pay reasonable commission may be implied from vendor's acceptance of voluntary services of broker rendered with an expectation of payment, provided vendor knew or had reason to believe that such services were rendered with an expectation of payment."

See also 8 Am. Jur., Brokers, § 159, pp. 1078-1080, § 146, pp. 1070-1071; 12 C. J. S., Brokers, § 61 (a), p. 139, § 78, pp. 170-171. Besides, the contract does not have to be in writing. Partee v. Pepple, 197 Miss. 486, 20 So. 2d 73.

 ██ The sharply disputed issue as to whether or not there was a contract, express or implied, between the parties, was properly submitted to the jury.

## DID APPELLEES, UNDER THE EVIDENCE, PROCURE THE SALE?

The evidence showed that, immediately following the agreement of the parties on August 1, 1962, the appellees launched their efforts and attempts to sell this property. They advertised in the papers and interviewed interested persons. For approximately six to seven weeks, the full time of the senior partner and much of the time of the younger partner was devoted to this matter. Their employee, Mrs. Mary Catherine Gerard first contacted Milton Smith, who brought his brother, Clarence, into the picture. The Smiths, with the map furnished by appellees, because Warwick V. Smith, their friend and next door neighbor, whom they did not wish to offend, was familiar with the property, asked the appellees to permit them to let him show it to them. The Smiths then allowed their cousin, W. L. Smith, to come into the deal for a half interest, which he wished to obtain for his two sons, and they, after telling Hill that they were going to buy the place, together with Edwin B. Hill, worked out the details. Hill had given the appellees the price of the land and the terms of its sale, and they, in turn, had relayed this information, except for increasing the consideration from $235 to $250 per acre to the Smiths.

 ██ In Partee v. Pepple, supra, this Court, after the study of a large number of Mississippi cases, citing them, deduced the following rule:

"1. Where the contract between the owner of the property and the agent specifies the price and terms of sale, the agent performs his duty, and is entitled to his commission, when he procures a purchaser ready, willing and able to buy, even though the owner may then decline to sell.

"2. Where property is placed in the hands of a real estate agent for sale at a certain price, and on specified terms, and a sale is brought about through the efforts of the agent as the procuring cause, he is entitled to his commission on the sale, even though the final negotiations were conducted through the owner, who, in order to make the sale, accepts a price less than that stipulated to the agent, or when he sells at the price at which the agent was authorized to make the sale."

See also 8 Am. Jur., Brokers, § 168, p. 1085; 12 C. J. S., Brokers, § 91 (a), pp. 207-208, § 93 (a) pp. 215-217.

In the main, when a broker is the procuring cause of a sale, the question is one of fact for the jury. There is substantial authority to the effect that the broker, to be the procuring cause of a sale, must first call the purchaser's attention to the property and begin negotiations which lead to culmination. 8 Am. Jur., Brokers, § 172, pp. 1088-1089. See also 12 C. J. S., Brokers, § 91, (b & c), pp. 211-212, and 93 (a), pp. 215-217.

## IN REGARD TO THE AMOUNT OF COMPENSATION AWARDED BY THE JURY.

Hill, while denying that he made the contract and contending that he said the commission would have to be negotiated, in effect conceded that the Capps merited some compensation.

In the absence of a special agreement, if the services are performed in good faith, the broker is entitled to fair and reasonable compensation; and the amount, under the prevailing usage or custom, if there

is such, may, although not necessarily, serve as the measure. 12 C. J. S., Brokers, § 78, pp. 170-171; 8 Am. Jur., Brokers, § 146, p. 1071. Delta and Pine Land Company v. Wallace, 83 Miss. 656, 36 So. 263, Howie Brothers v. Bonds, 87 Miss. 698, 40 So. 227, Alexander v. Brumfield, 124 Miss. 177, 87 So. 9, and Shoebridge v. Hartwell Realty and Insurance Co., Inc., 244 Miss. 630, 141 So. 2d 558, cited by the appellants, are not contrary to the present holding, because the Capps, in the present case, "furnished the deal."

 Insofar as the liability of Mrs. Jeanette Hill is concerned, it appeared that extensive improvements were placed on the land with the consent of the owners. Under those conditions, Mrs. Hill did not lose title to this property. But the contract of sale, in which she was also a grantor, itself recited that she began to farm the land in 1949, and that, *with the consent of the owners*, she had made extensive improvements to the property, consisting of an irrigation system, a rice drier, and storage facilities for rice. It was then specified in the contract that these improvements, aggregating $64,-700 were to be paid from the consideration of $229,000 to be realized from the sale of the whole property. In other words, both the owners of the record title and Mrs. Hill, the owner of the improvements, to effect the sale, entered into a solemn contract in which they acknowledged the value of the improvements and specified that they constituted a fractional value of the property, to-wit, 64,700/229,000 of the value or purchase price of the property. Besides, Mrs. Hill had no part with her husband in the original conveyance. Perhaps her signature was not necessary; but at least her participation in this conveyance foreclosed any possible homestead right which she might have originally had in the property. Obviously she was a proper party to be named as a defendant.

On the question of liability of Edward B. Hill, it is clear that, if he did not have actual or apparent authority as agent of other defendants by reason of his representation to sell this property, then he himself was and remains liable for the judgment.

In the case of Kelly v. Guess, 157 Miss. 157, 127 So. 274, the appellee brought suit against Silas Kelly on a promissory note signed "C. & H. Kelly by Silas Kelly" and obtained a judgment against him. On appeal here, Kelly contended that the appellee could not recover without first having the note reformed in a court of equity. In overruling this contention, the opinion said in part: "This question is analogous to the question of the character of the liability of one who, without authority, executes a contract in the name of an alleged principal. There has been much diversity of opinion among the courts on the question. 'Three forms of remedy have been recognized by the courts as available to the other party to the contract, each being based upon a distinction in the nature of the liability: (1) an action against the agent upon the contract, as principal in the contract; (2) an action against the agent for damages for breach of his warranty of authority to execute the contract; and (3) an action for deceit where the agent has acted in bad faith in his assumption of authority.'

"In some jurisdictions the first named of these remedies has been adopted. Among the courts so holding is our own court, in Brown v. Johnson, 12 Smedes & M. 398, 51 Am. Dec. 118. They hold that one who enters into a contract in the name of an alleged principal, without authority, is liable upon the contract as principal; the reason for the rule being that it must be the intention of the party to bind some one, and, as the principal was not bound, the agent should be. The authorities so holding will be found collected in Kennedy v. Stonehouse, 13 N. D. 232, 100 N.W. 258, as reported in

3 Ann. Cas. at page 217 (note, pages 219, 220). Among those referred to in the note is our own case of Brown v. Johnson, Supra. There will be found a discussion of this question in 21 R.C.L., section 96, pp. 917, 918. To the same effect is Estes v. Jones, 119 Miss. 142, 80 So. 526.''

Consequently, a peremptory instruction having been granted in favor of Dr. William Kenan Hill, presumably because of insufficient authority of Edward B. Hill to represent him, Edward B. Hill under the above-cited cause, was clearly answerable for the failure of his representation.

██ ██ It is also contended in connection with the purchase by W. L. Smith, that no recovery could be made on this account because the appellees at no time actually contacted him.

However, the sellers had already found a purchaser for the property, namely, Milton Smith and his brother Clarence. These Smiths had signified their purpose to acquire the property. Their cousin, W. L. Smith, sought and was permitted to come into the deal for a one-half interest because of his concern for the welfare of two of his sons. In working out the details of the purchase, the deed was simply made to three parties according to the interests there designated. The sellers would thus realize the same amount of money but it would be from three instead of two parties. Obviously the position of the appellants in this respect is untenable.

The Court is unable to find any reversible error in the record. The issues were in sharp dispute by the witnesses for both sides; and consequently, such issues were for determination by the jury. The given instructions presented a sufficient statement of the applicable legal principles. The Court is unable to find any reversible error in the record and the cause must therefore be affirmed.

Affirmed.

*Kyle, Ethridge, Gillespie and Brady, JJ.*, concur.