MORGAN, et al. *v.* JACKSON READY-MIX CONCRETE

No. 42781          November 25, 1963          157 So. 2d 772

*Wells, Thomas & Wells, Jack W. Brand,* Jackson, for appellant, E. E. Morgan.

866

*Watkins & Eager,* Jackson, for appellant, R. W. Hyde, Jr.

*Butler, Snow, O'Mara, Stevens & Cannada,* Jackson, for appellee.

ETHRIDGE, J.

Jackson Ready-Mix Concrete, a corporation (called Ready-Mix), appellee, filed this suit in the Circuit Court

of the First Judicial District of Hinds County, against E. E. Morgan and R. W. Hyde, Jr., appellants, seeking to recover money due under a contract for concrete sand used in a large federal construction project in Oklahoma. Ready-Mix's assignor, Traxler Materials, Inc. (called Traxler, Inc.), furnished the sand. It was used in the construction by Hyde Construction Company, Inc. (called Hyde, Inc.), which plaintiff contends was the trade name, alter ego, or agent of a general construction partnership consisting of Morgan and Hyde. Hyde, Inc. was not a party to this suit. After a lengthy trial, the jury returned a verdict against both Morgan and Hyde, individually, in the sum of $119,461.83. The judgment under appeal was based upon that verdict.

There is no controversy on this appeal over the amount of the judgment, which was based on a contract of November 18, 1961 between Traxler, Inc. and Hyde, Inc. The basic issues are whether the jury was justified from the evidence in finding that Morgan and Hyde formed and continued for some time a partnership for general construction; whether Hyde, Inc., as an agent of the partners, acting within the scope of their partnership and its agency, contracted with the United States of America for the construction of the Spillway, Keystone Dam, Oklahoma; and if it did, whether Traxler, Inc. furnished sand under contract to the partners' agent, Hyde, Inc., for that construction. We hold these and other issues were jury questions, and affirm the judgment of the circuit court.

### I.

Both Morgan and Hyde were experienced contractors. Morgan also had considerable financial resources, and was experienced in financing transactions. Hyde was in the general contracting business for many years. In 1952 he incorporated Hyde, Inc., and was the owner of all of its stock (110 shares). Over the years Hyde

performed numerous large construction jobs through various means. Sometimes he contracted individually as Hyde, or as Hyde Construction Company, an unincorporated business operated by him. He also owned and had under his control at least six corporations: Hyde Construction Company, Inc.; Lacoste, Inc.; H & F Engineering Company, Inc.; Universal Bridge Company; Slade & McElroy, Inc.; and Talbert & Brown, Contractors, Inc.

Morgan and Hyde executed formal ''Articles of Partnership,'' dated January 1, 1958, but which Morgan said were signed in late April, 1958. The parties created by it a partnership under the name Hyde-Morgan, for a period of ten years from January 1, 1958, for the purpose of contracting and performing all kinds of construction work anywhere. Paragraph (3) stated: ''All bids for work shall be made in the name of R. W. Hyde, Jr., doing business as Hyde Construction Company, or other company under the control of Hyde.'' Under this sentence it is manifest the parties intended for bids and work to be done by Hyde or other companies under his control. Each party agreed to contribute half of the capital and half of the bond credit, with the net profits and losses to be shared and divided equally between them.

Under the Articles, Hyde or his representatives agreed to devote the necessary time and attention to bidding, acquiring jobs, and their performance. All jobs performed were to be under the direct management of Hyde or his representatives, but were subject to supervision and control of both parties at all times. Morgan was to assist in performance of such jobs only in an advisory capacity. Paragraph (6) provided that, out of each pay estimate received by the partnership, or in the name of Hyde, at least 1% of the gross receipts would be deposited when received ''into a reserve account of the partnership (designated as Hyde-Morgan Account)'' in a bank, and the funds would be withdrawn only on

signatures of both parties. Upon completion of a job, the proceeds from it in the reserve account would be divided equally between the parties, unless needed on other jobs. A complete and separate set of books and records were to be kept by A. N. Morgan and Associates, CPAs, at the establishment of Hyde Construction Company. Paragraph (9) provided: "The parties may agree to incorporate any job or jobs of the partnership from time to time as deemed advantageous so to do." The agreement pertained only to work which the partnership acquired by competitive bidding.

Two years and three months after its execution, the parties on March 21, 1960 signed a contract terminating the partnership, except for completion of certain jobs, including the Keystone project. However, both Morgan and Hyde testified that several days after the execution of the "Articles of Partnership," they concluded the partnership would not work, and terminated it by oral agreement between them. They said their relationship then was modified to limited purposes, under an agreement by which Morgan would use his credit and resources for the obtaining of funds for construction jobs performed by Hyde or his companies, and for bond credit for them. In other words, appellants contend that the written Articles of Partnership were modified by oral agreement of the parties a few days later; that from early 1958 to March 21, 1960 Morgan assisted Hyde solely in financing construction projects, and lending his credit in securing performance and payment bonds for Hyde's contracts.

Nevertheless, the evidence was in conflict as to whether the Articles of Partnership were so modified. This specific issue of fact was submitted to the jury by plaintiff's instructions and at least four instructions granted defendants, and the jury found against them. The evidence warranted this adverse finding, and the jury's conclusion that the general construction partnership con-

tinued under its terms until its formal termination on March 21, 1960, but continued even after that for the purpose of winding up the Keystone, and other current jobs. There were numerous facts and circumstances upon which the jury could base this result. In reviewing the verdict of the trier of facts, all facts and reasonable inferences from them must be considered in the light most favorable to appellee.

The accountant for defendants testified that early in 1958 a copy of the Articles of Partnership were furnished him for his information in rendering financial opinions; that he made regular financial statements as to different transactions until the partnership's formal termination on March 21, 1960, and was in frequent contact with both Hyde and Morgan; and copies of financial statements were sent to both parties. On July 18, 1958, A. N. Morgan (the CPA) wrote E. E. Morgan, with a copy to Hyde, a letter attaching a schedule "showing in summary form the earnings had by this joint venture of yours and Mr. Hyde's to date." In May, 1958 Hyde by letter instructed an insurance agent, with a copy to Morgan, to include Morgan's name in all liability policies then held by Hyde Construction Company, Hyde, Inc., Lacoste, Inc., and H & F Engineering Company, Inc. This was done, and the policies were amended to include Hyde-Morgan as an additional insured. Workmen's compensation policies were taken out in the name of Hyde-Morgan, but apparently no premiums were paid on them, since there were no employees of Hyde-Morgan, as such. Bids were made, and construction contracts entered into by companies "under the control of Hyde," as provided in Paragraph (3) of the Articles of Partnership. Accountant A. N. Morgan testified that, after execution of the partnership agreement, he discussed its problems with Hyde and Morgan, "and at that time it was decided to use these various corporate entities and slide these contracts into them." Various contracts were entered

into in the name of one of the companies under Hyde's control. The performance bond applications generally were signed by Morgan and Hyde individually and as copartners, and in the name of Hyde, Inc. Contracts under the Articles of Partnership were entered into in 1958, 1959 and early 1960. The bond applications were signed by Hyde as an individual and also by Morgan individually and as copartner.

On July 1, 1958 one-half of the outstanding capital stock of Hyde, Inc. was conveyed by Hyde to Morgan, for $11,000 in equipment. The parties continued signing bond applications in the same manner.

In the latter part of 1959 a bid was submitted in the name of Hyde, Inc. to the U. S. Army Engineer District, Tulsa, Oklahoma, in connection with the construction of the Spillway, Keystone Dam, Arkansas River, Oklahoma. This bid was accepted, in the amount of $16,173,876.86. The performance bond application for the specific contract involved in this suit was made to a bonding company, and was signed R. W. Hyde, Jr. individually, E. E. Morgan, individually and as co-partner, Hyde-Morgan, by R. W. Hyde, Jr., and by E. E. Morgan, and Hyde Construction Company, Inc., by R. W. Hyde, Jr. The bond was issued, and the construction contract was executed by the U. S. Army Engineers and Hyde, Inc. on November 18, 1959. Work was begun preparatory to its performance.

Charles Wilson, a representative of Hyde, Inc., contacted Ruel Traxler, president of Traxler, Inc., and told him they had been awarded the contract for Keystone Dam, and wanted Traxler to go there and produce the sand. Ruel Traxler sent his brother George to examine the project, and they decided not to take the job. Ruel said that in February, 1960 Morgan called him on the telephone, and, after inquiring whether he had been contacted about the sand work at the Spillway, Keystone Dam, Ruel answered that he had decided not to take it.

He said Morgan told him that "he was a partner with Bob Hyde on this job, and he didn't want no slip-up out there, wished that I would get together with them and go out there and manufacture the sand." Traxler advised Morgan he would think about it, and, after meeting with representatives of Hyde, Inc., an agreement was reached by which a new corporation created by Traxler, named Traxler Materials, Inc., would furnish sand for the job. This purchase order, dated March 4, 1960, was signed for Hyde, Inc. by its secretary-treasurer, and directed to Traxler Materials, Inc. It provided that Traxler, Inc. would furnish approximately 355,284 tons of "fine aggregate in accordance with government specifications" for the Keystone Dam, to be delivered at the stockpile at 75¢ a ton. Traxler, Inc. then proceeded to transport from Mississippi to the Keystone site a large amount of equipment, including a plant to produce the river sand. Hyde, Inc. put up a blending plant, to mix the coarser river sand with a "blow" or fine sand.

On March 21, 1960, seventeen days after the purchase order for sand, Hyde and Morgan executed a document called "Termination of Partnership and Settlement of Estate." It recited that on January 1, 1958 Morgan and Hyde had created the partnership, "and said partnership has served its usefulness and the parties desire to terminate such partnership and settle the estate among themselves." Hence the partnership was terminated, but it was further stated "that a list of jobs of the parties under contract and in progress are: . . .," following which was an itemization of seventeen different construction contracts, adequately identified, in Kentucky, Alabama, Oklahoma, and Mississippi, including the following: "Contract for construction of Spillway, Keystone Dam, Arkansas River, Oklahoma, Contract No. DA-34-066-CIVENG-60-864."

The termination agreement further provided that the parties had settled among themselves the disposition of all assets and liabilities "of the partnership estate," and each partner had been paid and had received his share in the partnership estate; that Hyde agreed to indemnify and save harmless Morgan from any loss on any bond executed by Morgan "for this partnership"; that Hyde agreed to pay all claims and obligations "incurred by this partnership"; that Hyde agreed to pay Morgan 1% of the net amount of all earned estimates "on all jobs listed above as and when paid after date and until the completion and settlement of the last of said jobs of the partnership." It also stated that Morgan was a signatory on payment and performance bonds and notes "of the partnership," and that Hyde agreed to assume all liabilities and to save Morgan harmless from any loss arising out of outstanding contracts and bonds "of the partnership." The parties deemed it "undesirable and unnecessary . . ." to publish notice of dissolution of this partnership and settlement of this partnership estate . . ."

The termination agreement recognized and the parties agreed that the partnership relationship was not totally ended "until the completion and settlement of the last of said jobs of the partnership," including specifically the Keystone Dam Project. The record reflects that the seventeen contracts listed in the termination agreement were taken in the name of various companies controlled by Hyde, including Hyde Construction Company, Hyde, Inc., Lacoste, Inc. and H & F Engineering Company, Inc.

Further, the parties agreed it was not desirable to publish notice of dissolution of the partnership. No one informed any representative of Traxler, Inc. or Ready-Mix that the partnership had been terminated, or there had been any change in the relationship between Hyde and Morgan. On the date of execution of the termination agreement (March 21, 1960), Morgan

transferred his stock in Hyde, Inc. to Hyde, Inc., and the Hyde-Morgan reserve account was terminated shortly thereafter. Following those actions the parties operated under the provisions of the termination agreement. Hyde, Inc. paid Morgan for his 55 shares of stock in Hyde, Inc., purchased for $11,000, the sum of $450,000.

■■ ■ Under all of the foregoing circumstances, the jury was amply warranted in finding that Hyde and Morgan organized a general construction partnership on January 1, 1958, and that it continued as an active partnership through March 21, 1960; that it continued thereafter, under the provisions of the termination of partnership agreement, in order to complete performance of the contracts itemized in the termination agreement, including the Keystone job. The latter contract recognized that completion and settlement of all of these itemized jobs remained to be done, that Morgan was entitled to 1% of the net amount of all earned estimates on them, and that, for the purpose of winding up the partnership, these relationships continued during the interim period until conclusion of the remaining construction jobs.

## II.

■■ ■ Furthermore, the jury was amply justified in concluding that Hyde, Inc. acted as the agent of the Hyde-Morgan partnership in bidding and executing the construction contract for the Spillway, Keystone Dam and the sand-supply contract with Traxler, Inc. This corporation was the agent of the partners in this respect. The Articles of Partnership provided that all bids for work should be made "in the name of" Hyde or companies under the control of Hyde, and jobs should be under the direct management of Hyde. They intended that the partnership would operate through Hyde and his corporations. That was exactly what happened in

the instant case, and in numerous other construction jobs. Hyde, Inc., as an agent of the partners, made the contract for furnishing sand with Traxler, Inc.

1 ALI, Restatement of the Law of Agency 2d (1958), § 21, discussing the capacity of an agent, states: "Any person has capacity to hold a power to act on behalf of another." Accordingly, "A corporation, partnership, or other association has capacity to act as agent. ... A corporation may become an agent of an individual or of another corporation, as it does when it makes a contract on the other's account." Ibid., § 14M.

3 Am. Jur. 2d, Agency, § 13 states: "A corporation may act as an agent for an individual principal or for another corporation." National Plumbing Supply Co., Inc. v. Torretti, 237 Mo. App. 570, 175 S.W. 2d 947 (1943); Mencher v. Weiss, 306 N.Y. 1, 114 N.E. 2d 177 (1953); Kourik v. English, 340 Mo. 367, 110 S. W. 2d 901 (1937); 3 C.J.S., Agency, § 220. "Whether such relationship exists in any particular case may be proved by circumstances, such as the relation of the parties and their conduct with reference to the particular subject matter dealt with." 6 Fletcher, Cyclopedia Corporations (rev. ed. 1950), § 2600.

The test of agency is derived from a study of the facts of each case. A distinction must be drawn between imposing liability on a principal because of the existence of the agency relationship, in our common law understanding of that relation, from cases in which the corporate veil of the subsidiary is pierced for other reasons of policy. This is a case involving an agency relation, of Hyde, Inc. to the partners. It is different from those cases dealing with disregarding a corporate entity. The latter is not involved here. 3 ALI, Rest. Agency 2d, § 14M, pp. 67-72; Pacific Can Co. v. Hewes, 95 F. 2d 42 (C.C.A. Wash. 1938); Whitehurst v. FCX Fruit & Vegetable Serv., Inc., 224 N. C. 628, 32 S. E. 2d 34 (1944); National Plumbing Supply Co. v. Torretti, 237

Mo. App. 570, 175 S. W. 2d 947 (1943). The relation of principal and agent, between the partners and Hyde, Inc., was adequately shown. Accordingly, the partners were liable individually for this obligation for sand, made for them by their agent, the corporation (Hyde, Inc.). The principals (Hyde and Morgan) are bound by and liable for the acts of their corporate agent done with or within the authority from its principals. 3 Am. Jur. 2d, Agency, § 261; 40 Am. Jur., Partnerships, § 136; 1 ALI, Rest. Agency 2d, § § 140, 159.

This case does not involve any issue as to the power of a Mississippi corporation to become a partner. See 13 Am. Jur., Corporations, § § 823-825; Rowley, The Corporate Partner, 14 Minn. L. Rev. 769 (1930); Port Arthur Trust Co. v. Muldrow, 155 Tex. 612, 291 S. W. 2d 312 (1956), noted in 35 Tex. L. Rev. 265; Barrett & Seago, Partners and Partnerships: Law and Taxation (1956), § 7, pp. 65-70 (joint adventure); Lindley, The Law of Partnership (9th ed. 1924), p. 105.

■■■ Although not as precise as it should have been, the declaration adequately alleged agency. It averred that the Articles of Partnership authorized construction contracts to be made "in the name of" Hyde or companies under his control, and that Hyde, Inc. made the sand agreement with Traxler, Inc. pursuant to the partnership agreement. Morgan's answer denied this. In effect it and Hyde's answer denied any agency. The principal instruction granted plaintiff on the merits stated in part that, if the jury found that Hyde and Morgan formed a partnership "and acting within the scope of their partnership agreement, did contract in the name of Hyde Construction Co., Inc." with the United States for the construction job, and the contract was performed by the defendants as partners; and that Morgan represented to an official of Traxler, Inc. that Hyde, Inc. was performing the work under the contract as a partnership project with Hyde and Morgan as

partners, that the sand was furnished, and no notice of termination of the partnership was given to Traxler, Inc., then Hyde and Morgan were liable to plaintiff for the costs of the sand.

Defendants' instructions submitted to the jury issues pertaining to whether the partnership was one limited to the raising of funds and the acquiring of bond credit, whether the general construction partnership was terminated shortly after its execution, and the question of notice to officers of Traxler, Inc. of dissolution of the partnership. Defendants' Instruction No. 8 told the jury that, before it could return a verdict for plaintiff, it must find that in fact a partnership existed between Hyde and Morgan for engaging in the construction business, and such partnership, if it existed, in fact engaged in the construction business at the Keystone Project "either itself or through agents"; that plaintiff and its assignor intended to receive the obligation of the partnership, not solely that of Hyde, Inc., and under the agreements of March and November, 1961, plaintiff intended to obtain the obligation of the partners for payment; and, if the plaintiff failed to prove each and all of these matters, then it should return a verdict for defendants. These instructions also submitted to the jury the pertinent issues, including that of the agency of Hyde, Inc. for the partners.

Appellee states in one place in its brief that its contention is defendants operated at least a portion of their partnership business "under the trade name" of Hyde, Inc., not that Hyde, Inc. was an agent of defendants. The Articles required jobs to be done "in the name of" Hyde or companies under his control. The difference between a partnership operating "in the name of" a corporation, and a corporation being the agent of partners is under these facts immaterial and unrealistic. The pleadings and the instructions adequately presented the issue of agency, and the facts supported a finding to that effect.

■■■ Under modern pleading and practice the courts correctly permit a "large degree of generality in pleadings in which the party attempting to enforce the contract against the principal attempts to affirmatively allege the agency." 3 Am. Jur. 2d, Agency, §§ 344, 343; 3 C.J.S., Agency, § 312; Anno., 45 A.L.R. 2d 583, 587, 591 (1956); cf. Prairie Lodge v. Smith, 58 Miss. 301, 309-310 (1880).

### III.

■■■ The statute of frauds requiring agreements which are not to be performed within the space of fifteen months from their making to be in writing does not affect the purchase order of March 4, 1960, or the later agreements. Miss. Code 1942, Rec., § 264(d). The possibility of performance within fifteen months takes the contract out of the operation of the statute. United States Finance Co., Inc. v. Barber, No. 42,782, decided November 4, 1963.

■■■ The defendants pleaded only and may raise only the foregoing part of the statute of frauds. However, they argue in their briefs that, if there was an agency by Hyde, Inc. for the partners, it was not in writing, and thus violated the requirement that contracts for the sale of an interest in lands for a longer term than one year should be in writing, signed by the party to be charged therewith, "or some person by him or her thereunto lawfully authorized in writing." Miss. Code 1942, Rec., § 264(c). The written Articles of Partnership authorized Hyde or companies under his control, as was Hyde, Inc., to make construction contracts in such agents' names. The entire conduct of the parties throughout the period of furnishing the sand by Traxler, Inc. warranted the jury in finding that the original purchase order and subsequent modifications of it were made by Hyde, Inc. with the other contracting party pursuant to the partnership arrange-

ment. Hence the authorization of agency was in writing. ■■ ■ Moreover, the contract to furnish the sand was not within section 264(c) because it did not pertain to "the sale of lands," since the duty of Traxler, Inc. was to provide sand from no particular, described tract, but as personalty, to be used in constructing the Spillway. In fact, much of the sand was obtained from the bed of the river across which the dam was constructed. Cf. Towles v. Hodges, 235 Miss. 258, 108 So. 2d 884 (1959); 49 Am. Jur., Statute of Frauds, § 156.

Subsequently the parties had a dispute as to the price which was to be paid for the sand. There had been difficulty in supplying the government with acceptable samples of "blow" sand, Traxler, Inc. contending they were to furnish only river and not "blow" sand, and that there was an oral agreement that the "blow" sand was to be blended by Hyde, Inc. Traxler, Inc. and Hyde, Inc. entered into an oral agreement that the former would do the blending and furnish "blow" sand at a price of $1.25 per ton. Traxler, Inc. began to furnish the "blow" sand, in October 1960, but conflicts between the parties continued, which resulted in a new written contract between Hyde, Inc. and Traxler, Inc. on March 8, 1961, which in effect guaranteed Traxler, Inc. its cost plus a profit of 5%. Another agreement created a socalled "joint venture" for the production of concrete sand and equal sharing in the profits.

On March 19, 1961 Ready-Mix purchased all stock of Traxler, Inc., which then acquired a new management. On November 22, 1961 Traxler, Inc. assigned to Ready-Mix all of its assets.

By June 1961 Hyde, Inc. was having financial difficulties, and, for the financing of the Keystone job, Morgan entered into an agreement with Hyde and Hyde, Inc. by which he was to have general control and management of the project and of disbursement of funds. Morgan would lend additional sums not exceeding one

million dollars upon the notes of Hyde and Hyde, Inc., secured by equipment. Final profits of the Keystone job were to be split between Hyde and Morgan. This agreement stated that the parties did not intend to create a partnership. Thereafter Morgan took over general supervision of the Keystone operation. On November 18, 1961 Traxler, Inc. closed down its sand operations, because it was not paid in accord with the prior agreement. On the same date it entered into three separate agreements with Hyde, Inc.: terminating the "joint venture" for the production of sand on the Keystone job; Traxler, Inc. leasing machinery and equipment for the project to Hyde, Inc.; and establishing a method for determining the amount due Traxler, Inc. for sand delivered to the Keystone Dam contract. It was agreed that the balance due was cost plus 5%, less any amounts already paid Traxler, Inc., the figure to be designated by A. N. Morgan, CPA. He subsequently made the computations, and testified the total amount due, including interest, was $119,461.83. That was the amount of the jury verdict. During the progress of the Keystone job, Morgan and Hyde borrowed money from a bank, deposited it in the Hyde-Morgan Reserve Account, and then transferred it to Hyde, Inc. Well over a million dollars of this borrowed money, borrowed by Hyde and Morgan, were transferred and processed in this manner.

Appellants contend that the November 18, 1961 agreement constituted a novation, and, even if they were previously liable, the alleged novations released them. There was adequate evidence to warrant the jury in finding that plaintiff dealt with defendants as partners, relied upon their liabilities as such, for the entire time during which the materials were furnished, until November 18, 1961; and, as we have previously held, that no notice was given to Traxler, Inc. or its representatives of termination of the partnership. Hence no issue of novation is involved.

However, assuming it is, the burden of proof rested on defendants asserting a novation to establish it. 66 C.J.S., Novations, § 26. In order to do this, there must appear the consent of the contracting parties that the new agreement was to have this effect. In other words, whether a novation was accomplished depended on whether the parties intended to extinguish the old obligation by substituting the new one for it. Ibid., § 11; Anno., 61 A.L.R. 2d 755, 759 (1958). On proper instructions the jury found against defendants' contention in this respect. There is no substantial evidence indicating there was any intention to change the liabilities of the parties. At any rate, still assuming novation was an issue, this was a question of fact for the jury on whatever slight conflicts in the evidence there may have been. 66 C.J.S., Novations, § 27.

Affirmed.

*Lee, P. J., and Kyle, Rodgers and Jones, JJ.,* concur.