This appeal arises from the Chancery Court of the First Judicial District of Hinds County. It involves the liability of Fred A. Hoerner upon a continuing guaranty agreement to the First National Bank of Jackson and the subjugation of mining stock pledged by him as security for payment of a corporate loan.
In 1957 Fred A. Hoerner (hereinafter Hoerner), a businessman of Jackson, became the owner of 50% of the stock in Shinault Lumber Products, Inc. (hereinafter Lumber Products) of Olive Branch, Mississippi. The owner of the remaining corporate stock was Spain Shinault. The corporation's primary business in its early stages was the wholesale brokerage of lumber products, the details of the business being managed by Spain Shinault.
The corporation orginally had a line of credit with a bank in Memphis. Thereafter, in 1958 Lumber Products began doing business with the First National Bank of Jackson (hereinafter First National). The financial arrangement between Lumber Products and First National was that the latter extended a line of credit to Lumber Products whereby it could assign invoices of its customers to the bank and borrow upon them. In practice First National notified the customers of Lumber Products of the assignment of the invoices to it in order to prevent direct payments to Lumber Products. On August 18, 1959, Hoerner, being dissatisfied with this practice, requested that it be discontinued since it was his opinion that notification of Lumber Products' customers conveyed the thought of corporate financial instability to its detriment. In his letter to First National requesting that the practice of notification be discontinued, Hoerner reminded the bank of his personal guaranty for its security. First National approved the requested modification by its letter of August 15, 1959, indicating that it would continue to rely upon Hoerner's existing guaranty of $100,000 executed in November 1958.
On November 3, 1959, Hoerner signed a continuing guaranty, now in dispute, to First National to secure "any and all credit extended to the Shinault Lumber Products, Inc. to the extent of $100,000." This guaranty was upon a printed form supplied by First National. However, there was typed into it a provision requested by Hoerner that "all loans made after this date shall be approved by the undersigned." *Page 757 
Thereafter, a series of loans was made by First National on wholesale invoices received by it from Lumber Products without notification that the invoices had been consigned to the bank for loans and also, according to Hoerner, though disputed by other witnesses, without notice to him for approval as specified in the guaranty of November 3, 1959. Employee witnesses of First National testified that on each loan they telephoned Hoerner and he approved each of the loans. This was disputed by Hoerner. No written evidence is available to indicate prior approval by Hoerner to the extension of credit by First National.
In 1966 Lumber Products ventured into the lumber manufacturing business, though continuing its brokerage activities, and sought financing from First National for the contruction of a manufacturing plant to be located at Olive Branch, Mississippi. First National agreed to interim construction financing of the plant, but required a continuing guaranty of $60,000 to be executed by Hoerner and Spain Shinault. This guaranty was returned to Hoerner in 1969 after permanent financing was arranged between the parties and is not involved in this litigation.
In October 1967 Lumber Products negotiated permanent financing for the construction of its plant with First National. It executed a term note for $100,000 to the bank and secured it by a deed of trust upon the plant site in DeSoto County and by a pledge of securities from Hoerner and Spain Shinault. Hoerner's letter of October 2, 1967, to First National relating to the pledge of securities is in part as follows:
 In accordance with our conversation the other day I am pleased to enclose herein municiple (sic) bonds in the sum of $25,000 as security on a $20,000 portion of a loan to Shinault Lumber Products, Inc. at Olive Branch, Miss.
 . . . . . .
 It is understood that as Shinault's loan is reduced, a proportionate amount of above securities will be returned in proportion to the amount of reduction of the loan.
Thereafter, on October 19, 1967, Hoerner executed a borrowed collateral certificate assigning his interest in the bonds therein enumerated to Lumber Products to be used as security by it for the loan, the consideration for the certificate being a loan to be made by First National to Lumber Products. This certificate contained a "catch all" provision which stated the securities were pledged "for any and all other indebtednesses of said borrower to you," the borrower being designated in the certificate as Lumber Products. On this same date Lumber Products executed a term note to First National in the sum of $100,000 upon which there was listed as security the identical bonds enumerated in the borrowed collateral certificate. This note contains, among other things, the following language:
. . . The holder of this note shall also have a lien on all of the above mentioned collateral for any other debt due or to become due by the maker or makers hereof to such holder."
Thereafter, Hoerner became displeased with the manner in which the assigned stock was being managed by First National. He requested the bank to exchange the pledged bonds for 200 shares of Minnesota Mining Manufacturing Company stock. First National approved the exchange of security and on November 23, 1968, returned the bonds and borrowed collateral certificate to Hoerner[1] and accepted the *Page 758 
Minnesota Mining Manufacturing Company stock in place of the bonds.
The loans made by First National to Lumber Products from 1958 until May 1969 on the invoices were numerous and substantial. The minutes of the corporation which were compiled by Hoerner as secretary of the board of directors, the board being composed of Spain Shinault and himself, reflected the following activities by the board at its annual meetings from 1965 through 1969:
 The meeting then proceeded to a consideration of the results of the corporation's operations during the preceding year, in the course of which such operations were examined in detail and consideration was given to all transactions of the corporation during such period. . . .
These minutes and other evidence also reflect that Hoerner received cash bonuses on various occasions from the business.
In May 1969 Lumber Products filed a petition in bankruptcy and subsequently the deed of trust was foreclosed, resulting in a sale for $95,000. This left a balance of $3,000 from the sale which is now held by First National to credit against other indebtednesses of Lumber Products under the provisions of the deed of trust.
Lumber Products remains liable to First National upon unpaid promissory notes for $82,206.48, with unpaid interest thereon of $5,449.46. Hoerner, being pressed for payment under the terms of his continuing guaranty and faced with forfeiture of the pledged Minnesota Mining stock toward payment, filed his bill of complaint to rescind the continuing guaranty and prayed that the pledged stock be returned to him. He contends that the guaranty of November 3, 1959, is not enforceable against him since he did not approve the loans as required by the "typed" portion of the guaranty and that First National has obtained full payment and satisfaction of the debt for which the shares of stock were pledged.
First National seeks judgment against Hoerner for $82,206.48, plus interest of $5,449.46, upon twenty-five promissory notes of Lumber Products remaining unpaid. By way of answer and cross bill it also seeks enforcement of the personal guaranty of Hoerner as well as the subjugation of the pledged stock toward liquidation of the indebtedness of Lumber Products. It contends that Hoerner by his actions waived the right to approve the loans made on the invoices under the continuing guaranty and that the mining stock is subject to the payment of Lumber Products' indebtednesses.
The lower court found Lumber Products to be indebted to First National in the amount sued for. It thereupon held the stock to be subject to the indebtedness of Lumber Products, but adjudged that Hoerner was not liable to the bank under his continuing guaranty agreement. From this decree Hoerner prosecutes a direct appeal, contending that the court erred in subjecting the stock to the indebtedness, and First National cross appeals, asserting that the court erred in relieving Hoerner of liability under his continuing guaranty.
 I.
We are of the opinion the lower court correctly concluded that the stock of Hoerner was security for the indebtednesses of Lumber Products. The record reveals quite clearly, we think, his intent to assign the bonds to Lumber Products for its use as collateral security for a loan from First National. While true that Hoerner's letter of October 2, 1967, sought to restrict the security to only a portion ($20,000) of the loan, nevertheless, the pledge was later expanded by the terms of the collateral security certificate to include ". . . for any and all other indebtednesses of the same borrower to you." The note of the borrower executed the same day and listing the same securities contains similar language which pledges the collateral to any and all other *Page 759 
debts of the borrower. Hoerner argues, however, that his letter of October 2 should be considered with the collateral security certificate to determine the meaning of the overall transaction and contends that when this is done, the written letter should prevail over the printed certificate as expressing the intent of the contracting parties. The cardinal rule of construction of contracts is, of course, to ascertain and give effect to the mutual intentions of the parties and to reject a construction which leads to unfair or unjust results unless the terms pointing thereto are unambiguous and express. Rubel v. Rubel, 221 Miss. 848, 75 So.2d 59 (1954).
In reviewing the negotiations culminating in a contract it is assumed that the previous negotiations are merged in the final document and that it expresses the intention of the parties. In 4 Williston on Contracts, section 618, at 720-721 (3d Ed. 1961), it is stated:
 "The primary object of the construction of a contract is to give effect to the intention of the parties, greater regard being given to such intent, when clearly revealed, than to any particular words used in expression thereof. In general, the intention of the parties is to be determined from the final agreement executed by them, rather than from preliminary negotiations and agreements, but previous agreements, negotiations and circumstances may be considered in determining the meaning of specific words and clauses."
The borrowed collateral certificate executed by Hoerner, which made the loan possible and the note of Lumber Products executed the same date for the loan, were the end products of the negotiation of the parties and expressed in unambiguous terms that the bonds of Hoerner were intended as security for the present loan and all other indebtednesses of Lumber Products to First National. The provisions of the prior letter must yield to the terms of the final contract. Such "catch all" provisions are neither unconscionable nor invalid and have been upheld by the decisions of the courts. See Brotherhood of Locomotive Engineers Securities Corp. of New York v. W.L. Shepherd Lbr. Co.,51 F.2d 153 (5th Cir. 1931).
The remaining question is whether the exchange of the mining stock for the pledged bonds limited the security of the substituted stock to an indebtedness less than that afforded by the bonds. Hoerner contends that by returning the borrowed collateral certificate to him without demanding another certificate First National limited the substituted security to the immediate transaction and it was not inclusive of other indebtednesses of Lumber Products. He cites Restatement on Security, Pledges, section 11 at 38 (1941), as follows:
 1. A surrender of the pledged chattel to the pledgor terminates the pledge subject to the conditions stated in Subsection (2).
 2. A pledge is not terminated by delivery of the chattel to the pledgor for a temporary and limited purpose relating to the maintenance of the value of the pledgee's interest and having to do with the protection, improvement or sale of the chattel, or where the chattel is an instrument or document, its handling or collection.
Although we are in accord with the general statement that the surrender of securities pledged for a loan to the pledgor would ordinarily terminate the pledge, we do not think it applicable here since this was a substitution or exchange of security as distinguished from a surrender of security. In fact, Restatement on Security, Pledges, section 40 at 122-123 (1941), indicates that such substitution may be made, stating:
 a. Changes in the pledged chattel may result from substitutions which the pledgor is allowed to make, from changes by a corporate action or operation of law, from collections for harm done to the *Page 760 
chattel by third persons, from the payment of insurance policies, or from the enforcement of security interests, . . . In all such cases the proceeds or the substituted things are subject to the pledgee's security interest. . . . (Emphasis added.)
The exchange or substitution of security was initiated by Hoerner for his benefit only. Though he now contends in effect that a novation of the contract occurred upon the substitution of the securities, we are unable to detect evidence thereof since the parties remained the same, the debt remained the same and there was no consideration for novation. Adams v. Power, 48 Miss. 450
(1873). See also Morgan v. Jackson Ready-Mix Concrete,247 Miss. 863, 157 So.2d 772 (1963), and Sussman, Wormser Co. v. Sea Food Co., 127 Miss. 420, 90 So. 116 (1921). At most the contract was merely modified by the substitution of stock for bonds and even though the borrowed collateral certificate which listed the bonds was returned to Hoerner, the language of the note, "The holder of this note shall also have a lien on all of the above mentioned collateral for any other debt due or to become due by the maker or makers hereof to such holder," subjected the stock to the debts of Lumber Products. This statement is verified by Hoerner's letter of August 15, 1969, addressed to an officer of First National subsequent to the strained relations between the parties where he stated with regard to the securities the following:
. . . [W]hen the mortgage was closed these two notes were paid off and then we entered into an extra agreement with both Shinault and myself putting up $20,000.00 worth of securities each. I am not arguing against this last transaction, but I will argue legally and otherwise against the so-called continuing guaranty as being applicable at the present time.
The trial court, in our opinion, did not err in subjecting the substituted securities to the indebtednesses of Lumber Products. We therefore affirm on the direct appeal.
 II.
First National contends on cross appeal that the court erred in denying recovery from Hoerner under his continuing guaranty of November 3, 1959, and in cancelling the same.
The continuing guaranty agreement, a printed form, was executed by Hoerner in consideration of First National's extending credit to Lumber Products in the amount of $100,000. As mentioned, the guaranty contained the following language typewritten upon it: "All loans made after this date shall be approved by the undersigned." Testimony was introduced by First National that each loan was made by it only after the approval of Hoerner had been obtained by telephone conversations. Hoerner denied this and was adamant in his position that his approval was not obtained for the loans. The chancellor reserved his ruling upon objections to the testimony of the witnesses of First National, the basis of which was that parol evidence was not admissible to vary the terms of a contract required by law to be in writing. In his finding of fact, however, the chancellor was of the opinion that the testimony was inadmissible under Nason v. Morrissey,218 Miss. 601, 67 So.2d 506 (1953), and thereupon held that Hoerner was not personally liable for the notes sued upon. We reverse.
In Nason, supra, the author of the opinion emphasized that the Court was not dealing with a parol agreement to waive or modify a particular condition in a written contract where the parol agreement had been fully executed or fully performed. The opinion holds that a contract required by the statute of frauds to be in writing cannot be modified as to any material condition therein by subsequent parol agreement so as to render the original written *Page 761 
contract as modified an enforceable obligation. The facts inNason related to a written option to purchase land which was to be exercised within ten days from a certain date. The parties orally agreed to renew the option for a period of six months and additionally agreed that the escrow deposit be greatly increased. The oral agreement, both in time and escrow deposit, was the very heart of the contract. The option contract required by the statute of frauds to be in writing, was therefore completely altered in its material parts by the oral agreement and since this was so, this Court declined to enforce the modified contract. The contract of continuing guaranty now before the Court was not attempted to be altered by the testimony of the witnesses. There is nothing to indicate that the approval for the loans need be in writing. In fact, the method of approval was not indicated. The testimony sought to portray the method First National used in obtaining the approval of Hoerner. This was in accord with the typewritten portion of the guaranty rather than being opposed to or an alteration of it. The basic guaranty contract was unaffected by this testimony and it should have been permitted in evidence not only to portray the procedure used in obtaining Hoerner's approval of the loan, but also to determine whether his approval was in fact obtained. We are of the opinion that the chancellor erred in concluding this testimony to be inadmissible.
The more cogent issue remaining, there being no finding by the chancellor that Hoerner had approved the loans, is whether there is sufficient evidence reflected by the record to signify Hoerner's approval.
We are of the opinion that Hoerner is now estopped to disclaim liability under the continuing guaranty clause. He was the owner of 50% of the stock of Lumber Products. This corporation sought the loan from First National in order to carry on its corporate business. The loans were made primarily upon the basis of Hoerner's financial position. He sought the loans for the corporation and knew that his financial status made the loans possible. He initiated the transactions, the corporation was able to operate by virtue of the loans, and in fact, he received cash bonuses from the business. The minutes of the corporation, prepared by him, reflect that he had knowledge of and approved the various transactions of the corporation. Under these circumstances every element of an equitable estoppel is apparent. In Stokes v. American Central Insurance Company, 211 Miss. 584, 589, 52 So.2d 358, 360 (1951), we quoted with approval 19 Am.Jur., Estoppel, section 42, at 641 as follows:
 "Estoppel of this character arises from the conduct of a party, using the word `conduct' in its broadest meaning as including his spoken words, his positive acts, and his silence when there is a duty to speak, and proceeds on the consideration that the author of a misfortune shall not himself escape the consequences and cast the burden on another. Accordingly, it holds a person to a representation made or a position assumed where otherwise inequitable consequences would result to another who, having the right to do so, under all the circumstances of the case, has in good faith relied thereon and been misled to his injury." Of like effect is 31 C.J.S. Estoppel § 59, page 236. Cf. Kelso v. Robinson, 172 Miss. 828, 161 So. 135, 137, where it is said that this "doctrine lies at the foundation of morals; it is based on equity and good conscience." See also Martin v. Hartley, 208 Miss. 112, 43 So.2d 875. The two positions taken by Stokes are likewise inconsistent. . . .
See also U.S.F. G. v. Rice, 241 Miss. 307, 130 So.2d 924
(1961), and Wood Naval Stores Export Ass'n v. Latimer, 220 Miss. 652, 664, 71 So.2d 425, 430 (1954), wherein we stated: *Page 762 
 "Where one having the right to accept or reject a transaction takes and retains benefits thereunder, he ratifies the transaction, is bound by it, and cannot avoid its obligation or effect by taking a position inconsistent therewith. A party cannot claim benefits under a transaction or instrument and at the same time repudiate its obligations."
We note also in Fronkling v. Berry, 125 Miss. 763, 767, 88 So. 331, 332 (1921), the reaffirmation of that which was stated in Duff v. Snider, 54 Miss. 245, as follows:
 "In the notes to the case of Peter v. Compton, in 1 Smith's Lead.Cas. 438, it is said to be universally conceded that no one can receive or enjoy the goods or services of another, and then rely upon the statute of frauds as an excuse for not paying for them, . . . ."
We conclude that Hoerner could not accept the benefits obtained by the authority of his continuing guaranty agreement and belatedly reject the guaranty as being in violation of the statute of frauds. It is our opinion that there is sufficient evidence to signify Hoerner's approval of the loans. The acceptance of the benefits flowing from them could not be other than an implied approval by operation of law. The chancellor erred in rescinding the guaranty agreement and in finding Hoerner not liable under it. The decree of the lower court is therefore reversed on cross appeal and judgment rendered here reinstating the guaranty agreement and establishing liability of Hoerner thereunder.
We have carefully examined the other contentions of the parties on cross appeal and find them to be without merit.
Affirmed on direct appeal, reversed and rendered on cross appeal.
RODGERS, P.J., and SMITH, ROBERTSON, and SUGG, JJ., concur.
[1] Hoerner testified that the collateral certificate was returned to him on January 23, 1968. However, there is noted on the collateral certificate over the initial "H" that it was returned on November 23, 1968, there being no letter of transmittal or receipt in evidence.