**LYNN B. JEFCOAT, Plaintiff-Appellant,**

v.

**SINGER HOUSING COMPANY d/b/a the Mitchell Co., Defendant-Appellee.**

No. 78–1056.

United States Court of Appeals, Fifth Circuit.

June 20, 1980.

**540**

Samuel H. Wilkins, R. Conner McAllister, Jackson, Miss., for plaintiff-appellant.

Daniel, Coker, Horton, Bell & Dukes, Curtis E. Coker, Joe H. Daniel, Jackson, Miss., for defendant-appellee.

Before VANCE, POLITZ and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

This is an appeal by Plaintiff-Appellant Charles Brewer, trustee in bankruptcy for Lynn B. Jefcoat, from a judgment notwithstanding the verdict, entered in favor of Defendant-Appellee Singer Housing Company, d/b/a the Mitchell Co. (hereinafter referred to as the Mitchell Company), in an action to recover a broker's commission, or finder's fee, which Jefcoat claimed, under an alleged oral contract with the Mitchell Company, for locating land for the Mitchell Company to purchase which was ultimately purchased by it through another broker. We reverse.

### I.

Since a discussion of the facts is necessary to an understanding of our holding in this case, they will be here set out in detail. In the spring of 1974, Joe Wilson, city manager for the Mitchell Company for the Jackson area, told Jefcoat and some other realtors (including Robert Stewart, who ultimately participated in the negotiations for the sale of the subject property and was paid a commission by the seller) that the Mitchell Company was interested in acquiring raw land for development. The extent to which Wilson discussed compensation with the realtors, if at all, is disputed.

Jefcoat testified that Wilson told him that if he could find or could bring to the Mitchell Company land that they would be interested in buying for development, the Mitchell Company would pay a full real estate commission. Harvey McGehee, another realtor who was a business associate and friend of Jefcoat, testified that he heard the Mitchell Company tell Jefcoat that if Jefcoat could find a suitable piece of property which they purchased, then they

would pay Jefcoat a commission. In fact, McGehee too attempted to find raw land for the Mitchell Company in order to earn the promised commission. Watson Purvis, another realtor, previously employed by Jefcoat and McGehee, testified that he knew that Jefcoat had an agreement with the Mitchell Company to try to locate property for them to develop. Furthermore, Purvis testified that subsequent to his employment with McGehee, he was contacted by the Mitchell Company and talked to Wilson regarding employment. Wilson told him that they would like him to locate raw land to purchase and develop. When he asked what type of agreement they would be working under, he was told that he would be paid a commission by the Mitchell Company for land he located for them that they bought.

Wilson denied having any discussion with the realtors as to how they would be compensated for helping find raw land. He assumed they knew, but did not tell them, that the seller would pay the commission. Wilson and Mayer Mitchell, vice-president of Singer Housing Company, testified that Wilson would not, without permission, have authority to arrange for the Mitchell Company to pay a finder's fee.

Jefcoat's efforts to find property for the Mitchell Company, in accordance with what he had been told by Wilson, resulted in his locating a tract of land in the reservoir area owned by George Harrison. Jefcoat, apparently trying to find out how to reach Harrison, contacted Stewart, who owned land adjacent to Harrison's, and inquired about the availability of an easement or right of way, which Stewart said could be arranged. Stewart testified that he did not remember whether Jefcoat told him that his prospective purchaser was the Mitchell Company. Jefcoat contacted Harrison (which required him to make some long distance calls at a cost of $100 or $200) and obtained information concerning the property to give the Mitchell Company, including plats (which he had copied for about $15.00). Harrison testified that he did not remember talking to Jefcoat, much less whether Jefcoat told him that his client was the Mitchell Compa-

ny. It was Harrison's practice to require someone who was interested in buying property from him to make an offer without Harrison's setting a price on the land.

Jefcoat told Wilson about the land he had found and Wilson arranged for Jefcoat to take Mitchell Company representatives, including Mayer Mitchell, to see the property when they came to Jackson from the home office in Mobile in April of 1974. The extent to which Jefcoat's party examined the property on that trip is disputed, but they at least saw the tree line. Furthermore, Harrison did not at that time own all of the land ultimately purchased from him by the Mitchell Company. Jefcoat testified that he told the Mitchell Company's representatives that he did not know what Harrison would take, but, based on his knowledge of a previous attempt to buy the land, he thought it would take more than $3500 an acre to buy the tract. Mayer Mitchell did not recall Jefcoat's telling him that it would take more than $3500 an acre to buy the land. Jefcoat had no further communication with Mitchell Company representatives other than Wilson concerning the Harrison property. Jefcoat last met with Wilson in October of 1975. Wilson told him that the Mitchell Company was still very interested in the property and that he would be contacted when the representatives from the home office came back to Jackson. At that time, Jefcoat went into the oil business. In March of 1976, Jefcoat learned from a third party that the Mitchell Company had purchased a sizeable tract of land from Harrison in the reservoir area.

At this juncture it should be noted that at the time Jefcoat took the Mitchell Company's representatives to view the Harrison property, Jefcoat was a partner and principal in the realty company of McGehee-Jefcoat and Companies, Inc. (McGehee-Jefcoat). The Administrator of the Mississippi Real Estate Commission, J. Daniel Schroeder, called by the defense as an expert witness, testified that a corporate real estate license was issued to McGehee-Jefcoat but his records did not indicate the identity of the supervising or employing broker in

that firm. It appears that Jefcoat also held an individual license and maintained an office in connection with his business as a contractor. Subsequent to the time the Mitchell Company's representatives went with Jefcoat to view the Harrison property, McGehee-Jefcoat was given, by letter agreement dated April 30, 1974, the exclusive listing of certain Mitchell Company residential housing units in the Jackson area. The letter agreement contained no reference to raw land but Jefcoat contended that it set forth the full terms and conditions of their agreement with respect only to the exclusive listing on residential houses. He asserted that the contract on which this suit is based was a separate oral agreement. According to Mayer Mitchell, the Mitchell Company has a formal and firm policy that no contracts are oral.

In May, 1974, the firm of Associated Realty Co., which was formed for the purpose of staffing the Mitchell Company houses, was issued a corporate real estate license. The Real Estate Commission records contained a letter on McGehee-Jefcoat stationery stating that Jefcoat and others were to be broker-salesmen under Associated Realty Co. The supervising or employing broker was Admal Marshall. Jefcoat left Associated Realty Co. in December of 1974 and, before going into the oil business, continued his construction business.

In 1975, Stewart decided to sell two pieces of land that he owned, located to the east of the Harrison property, totalling about forty acres. He approached Harrison and others attempting to sell the two tracts. In the summer of 1975, Stewart was told by some engineers who were working for him that the Mitchell Company was interested in acquiring some land in the reservoir area where his two tracts were located. Stewart had met Wilson at a homebuilders' meeting and on one occasion Wilson told him that the Mitchell Company was interested in acquiring land in that area for a subdivision. Stewart called Wilson and took him to look at some land in that area, including land Stewart owned and land that he had authority to show him. Stewart was then in the process of closing a transaction whereby

Harrison was to acquire his forty acres. Stewart indicated to Wilson that he was committed to sell Harrison the forty acres but promised to find out if Harrison would sell it. The transaction between Stewart and Harrison closed on September 12, 1975. Within a couple of weeks after that, Stewart, having known Harrison for several years, convinced him that he could not get an offer from the Mitchell Company unless he stated a price and was able to secure from Harrison a price of $4500 an acre for his property. Stewart and Harrison were then under the impression that the Mitchell Company was interested in purchasing all the acreage that Harrison owned in that area. Harrison, Stewart and the Mitchell Company's representatives met several times and when, at one meeting, it became apparent that the Mitchell Company wanted to buy only about sixty-seven acres, which included the forty acres Harrison had recently acquired from Stewart, Harrison left the meeting. Stewart discussed the matter further with Harrison and eventually Harrison agreed to sell about 102 acres (including the forty acres Harrison had obtained from Stewart) if the Mitchell Company wanted it. This was sometime around October, 1975. A few months later the sale of the 102 acres was consummated with the Mitchell Company paying $4500 an acre (or $459,000 total purchase price) and meeting certain requirements Harrison imposed concerning sewer and water and street access. Harrison paid Stewart a six percent commission.

The jury returned a verdict for Jefcoat's trustee in bankruptcy against the Mitchell Company in the amount of $16,696.80. The trial court sustained the Mitchell Company's motion for a judgment notwithstanding the verdict, vacated the judgment entered for the trustee and gave judgment for the Mitchell Company. This appeal followed.

II.

Because the district court failed to discuss or assign any reasons for his action in granting the judgment non obstante ve-

redicto, it is incumbent upon us to consider each of the nine grounds upon which the motion was based. The propriety of granting a directed verdict or judgment n. o. v. is assessed by the standard enunciated in *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir. 1969) as follows:

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

(Footnote omitted.)

■ The first ground relied upon by the Mitchell Company is that there was no substantial evidence of the existence of a contract between Jefcoat and the Mitchell Company which would call for the payment of a commission. The Mississippi Supreme Court has said that " 'In order for a real estate agent to recover for services rendered a party in making a sale of real estate, there must be a contract, express or implied, creating the relation of principal and agent.' " *Shoebridge v. Will C. Hartwell Realty & Insurance Co.*, 244 Miss. 630, 141 So.2d 558, 559–60 (1962) (quoting from the court's syllabus in *Russell v. Johnson*, 126 Miss. 896, 89 So. 773 (1921)).

We think that the evidence adduced at trial, set out in detail above, viewed in light of the *Boeing v. Shipman* standard, was sufficient for the jury to conclude that an oral contract existed between Jefcoat and the Mitchell Company under which the Mitchell Company was obligated to pay Jefcoat a reasonable fee for finding and bringing to them suitable land which they purchased for development.

■ The second ground asserted by the Mitchell Company in support of its motion is that the agreement relied upon by Appellant violates Mississippi law in that it is not in writing. On the contrary, while a contract for the sale of land must be in writing under the statute of frauds, Miss.Code Ann. § 15–3–1(c) (1972), in Mississippi, a contract employing a real estate broker may be oral. *Minter v. Hart*, 208 So.2d 169, 170 (Miss. 1968); *Hill v. Capps*, 248 Miss. 601, 160 So.2d 186, 190 (1964).

The Mitchell Company's third ground is that the statute of frauds bars recovery since the alleged contract involved services which were not to be performed within fifteen months. Since the services could have been performed within fifteen months, recovery is not barred by the Mississippi statute of frauds requiring a writing in order to maintain an action "upon any agreement which is not to be performed within the space of fifteen months from the making thereof . . ." Miss.Code Ann. § 15–3–1(d) (1972). *See, e. g., Morgan v. Jackson Ready-Mix Concrete*, 247 Miss. 863, 157 So.2d 772, 779 (1963) ("The possibility of performance within fifteen months takes the contract out of the operation of the statute."); *United States Finance Co. v. Barber*, 247 Miss. 800, 157 So.2d 394, 397 (1963) ("to bring a particular contract within the statute, there must be a negation of the right to perform it within fifteen months").

The Mitchell Company's fourth ground is that the proof as to the amount of money Harrison wanted and the quantity of land, if any, which could be purchased from Harrison through Jefcoat's action was so indefinite that there was never any agreement which could form the basis for recovery. This argument appears to be indistinguishable from the Mitchell Company's ninth ground, which is that Jefcoat was not the procuring cause of the purchase and is discussed later in this opinion.

The Mitchell Company asserts as its fifth ground that "[a]lthough there is casual testimony that a buyer may in some instances pay a real estate commission, the testimony is so vague, indefinite and uncertain in view of the positive testimony of Mr. Wilson, Mr. Mayer Mitchell, Mr. Watson Purvis, that in no instance had any of these witnesses known of a situation in which the buyer paid a real estate commission if land was subsequently acquired." (Transcript at 254.) This point clearly lacks merit.

■ The Mitchell Company's sixth contention is that under Miss.Code Ann. § 73–35–33 (1972) and Rules 22 and 23 of the Mississippi Real Estate Commission, Jefcoat did not have the right to bring suit in his own name for recovery of his fee since he was employed by broker realty companies which, it is argued, precludes his acting individually as a broker. Miss.Code Ann. § 73–35–33 provides in part as follows:

> (b) No real estate salesman shall have the right to institute suits in his own name for the recovery of a fee, commission or compensation for services as a real estate salesman, but any such action shall be instituted and brought by the broker employing such salesman.

Rule 22 of the Mississippi Real Estate Commission provides that a real estate broker who does not conduct an office under his own name but who is employed by or affiliated with another licensed broker on a fee division basis and performs services similar to those of a salesman must not at any time act independently as a broker and shall not perform any real estate service without full knowledge and consent of his employing or supervising broker. Rule 23 requires that the supervising or employing broker notify the Commission in writing of the names of brokers employed or affiliated with him.

Through the testimony of J. Daniel Schroeder, Administrator of the Mississippi Real Estate Commission, defense counsel sought to establish that there could be only one supervising or employing broker in a licensed brokerage company, with everyone else classified as broker-salesmen. Schroeder testified that that was correct and noted that the rule enabled the Commission to hold one individual responsible. As mentioned in the facts previously discussed, Schroeder's records did not show who the employing broker was for McGehee-Jefcoat but did show that as of May 24, 1974, Jefcoat was listed as a broker-salesman for Associated Realty Co. under Admal Marshall. It was Schroeder's opinion that until May 24, 1974, Jefcoat would not have been prohibited from finding property for a company and being paid a fee for it since he was then employed as an individual real estate broker and not under the scope of employment of any other individual, but that after that time, he could not have done so on his own.

No cases have been cited by either party construing the statute and regulations at issue and we do not deem it necessary to construe them. The trial court instructed the jury that no real estate salesman has the right to institute suits in his own name for the recovery of compensation for services as a real estate salesman, but the broker employing such salesman shall bring the action. The jury was further instructed that if they believed that Jefcoat was an officer and broker-salesman or salesman for McGehee-Jefcoat or Associated Realty Co. at the time he allegedly entered into the contract with the Mitchell Company, then they were required to return a verdict for the Mitchell Company. The instructions given are arguably ambiguous, but the parties do not argue that. There was testimony that Jefcoat was acting in his capacity as an individual broker and not as a real estate salesman throughout his dealings

with the Mitchell Company concerning the raw land. The jury was entitled to evaluate all the testimony, including Schroeder's opinions regarding the operation of the statute and regulations. We are of the opinion that viewed in light of the standard set out in *Boeing v. Shipman*, the evidence supported the jury's finding against the Mitchell Company on the issue of Jefcoat's right to bring suit in his own name.

The seventh ground relied upon by the Mitchell Company is that since Jefcoat had no records relating to the transaction in question, he violated Rule 29 of the Mississippi Real Estate Commission which requires brokers to keep on file for three years following consummation complete records relating to any real estate transaction. We do not think that precludes recovery of a commission in this case. As noted by the district court in allowing the rules and regulations of the Real Estate Commission to be entered into evidence, while the Real Estate Commission was created pursuant to an act of the Mississippi Legislature, it is not empowered to pass any laws and its enactments and rules and regulations do not have the force and effect of law.

As its eighth ground, the Mitchell Company cites Rule 31 of the Mississippi Real Estate Commission which provides that written agreements shall identify the property and contain all terms and conditions under which it is to be sold, no oral or written agreement shall require the listing party to notify the broker of his intention to cancel the listing after the definite expiration date and exclusive listings shall be clearly designated as such. The point sought to be made by Appellee is not clear, but it too appears to be without merit.

As the final ground asserted in support of its motion for judgment n. o. v., the Mitchell Company argues that it is not shown that there was any offer to sell the land or any given quantity of land, nor that there was ever an offer to buy the land. Furthermore, it is not shown that Jefcoat's efforts constituted the procuring cause for the ultimate purchase of some land from George Harrison by the Mitchell Company.

We think that the Mitchell Company's argument must fail in this case since the contract between Jefcoat and the Mitchell Company called for payment of a commission or finder's fee to Jefcoat for services he performed in simply locating suitable raw land which the Mitchell Company bought for development. Jefcoat is entitled to his commission because he has performed his duty under the contract which did not require that he be the procuring cause of the sale. Mississippi cases have not departed from the principles set forth in the case of *Roell v. Offutt*, 138 Miss. 599, 103 So. 239 (1925), which we think control our resolution of this issue. In that case, judgment for the real estate broker was affirmed based on the following reasoning:

(1) It is a well-established principle of law governing the obligations and rights of real estate brokers and their principals that where the terms of the sale are not specified in the contract between the principal and the broker and the actual sale is made by the principal, still the broker has performed his duty when he produces a purchaser to whom the principal sells. This principle is recognized in Cook v. Smith, 119 Miss. 375, 80 So. 777; Jenny v. Smith-Powell Realty Co., 125 Miss. 608, 88 So. 171; Johnson v. Sutton, 94 Miss. 544, 49 So. 970; Delta & Pine Land Co. v. Wallace, 83 Miss. 656, 36 So. 263. It is a question of what the contract was between the broker and his principal. If the terms are specified, the broker does not earn his commission until he produces a purchaser ready, willing, and able to buy upon the terms specified. But where the terms are not specified in the contract of employment, where they are to be fixed by the principal when the purchaser is produced by the broker and the sale is to be made by the principal, the broker has performed his duty when he produces a purchaser to whom the principal makes terms and sells. Under the latter principle, the broker is entitled to his commission because he has performed his duty under his contract of employment. It is a case where he is employed

for the purpose of finding a purchaser to whom the principal shall make terms and sale.

(2) Appellee did not make a strong case by his evidence, but we are of opinion that nevertheless it was sufficient to go to the jury. Appellee's evidence tends to prove, we think, directly and by reasonable inference, that he performed his contract with his principal in producing a purchaser to whom the principal sold.

The question is what are the terms of the contract between the principal and broker. In this case there was evidence under which the jury could have found that the broker was obligated only to find a piece of land which the purchaser ultimately bought. The terms of any purchase were not discussed. Mississippi cases recognize that the key issue is the nature of the undertaking agreed upon by the principal and the broker. Cases focus on the presence or absence of specified terms of the purchase or sale as evidence of the nature of the undertaking. Cases relied upon by the Mitchell Company for the proposition that in order to recover a commission, the broker must be the efficient, procuring cause of the sale are distinguishable on the basis of the terms of the contract between the principal and broker which indicate the nature of the undertaking upon which recovery of the commission is made to depend. Beyond that, the determination of whether the broker has sufficiently performed his contractual undertaking in order to be allowed recovery depends upon the facts and circumstances of each case.

In the following cases relied upon by the Mitchell Company, the contracts upon which recovery was sought specified price and terms of sale and, under the facts, the brokers were denied recovery: *Myres v. Seward*, 238 Miss. 520, 118 So.2d 864 (1960); *Reynolds v. Alexander*, 164 Miss. 860, 146 So. 305 (1933); *Stanley v. Grimes*, 158 Miss. 1, 128 So. 324 (1930); *Moore v. Rich*, 124 Miss. 283, 86 So. 772 (1921); *Swain v. Pitts*, 120 Miss. 578, 82 So. 305 (1919). *Reynolds v. Alexander* is illustrative of these cases. In that case, Reynolds listed some property with Alexander Realty Co. to be sold on definite, specified terms. 146 So. at 305–06. Alexander Realty Co. had a prospect named Rucker who was interested in purchasing Reynolds' property, but they could not arrange a sale on mutually satisfactory terms. *Id.* at 306. Subsequently, another real estate agent succeeded in arranging a sale between Rucker and Reynolds on different terms. *Id.* The court noted that Alexander Realty's claim to a commission was based upon the fact that they showed Rucker the property, and that Reynolds subsequently sold him the property. *Id.* at 307. In denying recovery to the Alexander Realty Co., the court emphasized that this was not a case of bringing the seller and purchaser together where no terms of sale were specified. *Id.* at 307–08. The court stated further that if the owner of land for sale "lists it, without naming the terms of sale, with several parties, the one whose efforts first produce a purchaser is held to be entitled to the commission." *Id.* at 307.

In two cases relied upon by the Mitchell Company where the terms of sale were not specified, the brokers were denied recovery because the evidence failed to establish the existence of such contractual relations as would sustain recovery, *Russell v. Johnson*, 126 Miss. 896, 89 So. 773 (1921), or because the contract between the broker and the principal provided for payment of a commission on any sale consummated through or as a result of the efforts of the broker and there was no showing that the broker dealt with the ultimate purchaser, or that he located, procured or found him as a prospective purchaser, *Shaul v. Merchants & Farmers Bank*, 254 Miss. 191, 181 So.2d 338 (1965).

At oral argument, counsel for the Mitchell Company cited as the strongest authority he had for his theory that the efficient, procuring cause requirement should be applied to preclude recovery in a case such as this one, the Third Circuit case of *Pivar v. Moseley*, 476 F.2d 113 (3rd Cir. 1973), which cited with approval *Hill v. Capps*, 248 Miss. 601, 160 So.2d 186 (1964). In *Pivar v. Moseley*, the broker was contacted by Kim-

brough regarding the availability of land for purchase. 476 F.2d at 114. Apparently, no terms were discussed. Pivar showed Kimbrough Moseley's tract and the three met and discussed the sale of the property. *Id.* Kimbrough reported the discussions to two associates who, unlike Kimbrough, were associated with the corporation that ultimately purchased property from Moseley, which property embraced more land than that originally offered. *Id.* In sustaining Pivar's recovery, the court stated the rule as follows:

> an agent must show that he was the effective or procuring cause in producing the result for which he seeks compensation, and . . . whether or not his efforts had such a substantial effect that he should be compensated for them depends upon the particular facts and circumstances of each case and is a question of fact to be resolved by the trier of fact.

*Id.* at 115.

In addition to citing *Hill v. Capps*, wherein the Mississippi Supreme Court stated that to be the procuring cause of a sale, the broker "must first call the purchaser's attention to the property and begin negotiations which lead to culmination," 160 So.2d at 191, the court in *Pivar v. Moseley* quoted from the Restatement (Second) of Agency § 448 and Comments a and c thereto as follows:

> "An agent whose compensation is conditional upon his accomplishment of a specified result is entitled to the agreed compensation if, and only if, he is the effective cause of accomplishing the result.
>
> Comment:
>
> a. *Meaning of effective cause.* An agent is an 'effective cause' as that phrase is used in this Section, when his efforts have been sufficiently important in achieving a result for the accomplishment of which the principal has promised to pay him, so that it is just that the principal should pay the promised compensation to him.

c. . . . an agent who has been promised compensation for his accomplishment of the result must show that his efforts have had substantial effect in producing it. Whether or not his efforts have had such a substantial effect that he should be compensated for them is a question for the triers of fact. . . ."

476 F.2d at 115 n. 1.

Not surprisingly, counsel for Appellant also relied upon this case. Defining the requirement of procuring cause as requiring that the broker produce the result for which compensation is sought is not inconsistent with permitting recovery of a fee for finding raw land which is ultimately purchased, even if the broker was not the efficient procuring cause of the ultimate sale, where that was the result contracted for by the parties.

We note that our holding in this case does not require one party to pay two commissions since the seller, Harrison, paid Stewart's fee and the purchaser, the Mitchell Company, is required to pay Jefcoat's fee.

In light of our discussion of the principles applicable to this case, we find no merit in the Mitchell Company's contention that the instructions given the jury do not adequately define procuring cause. If anything, the instructions overstate the showing Appellant was required to make in this regard.

Finding no merit in any of the grounds urged by the Mitchell Company in support of its motion for judgment notwithstanding the verdict, we reverse the judgment of the district court and remand this cause for further proceedings consistent with this opinion.

REVERSED and REMANDED.